1

2

3                          UNITED STATES DISTRICT COURT

4                         NORTHERN DISTRICT OF CALIFORNIA

5

6   JOHN MAA, et al.,                              Case No.  12-cv-00200-JCS

7                   Plaintiffs,
                                                   **ORDER GRANTING DEFENDANTS'
8            v.                                    MOTION TO DISMISS AND
                                                   DISMISSING FIRST AMENDED
9   JAMES W. OSTROFF, et al.,                      COMPLAINT WITH LEAVE TO
                                                   AMEND**
10                  Defendants.
                                                   **Dkt. No. 29.**

11

12  **I.      INTRODUCTION**

13          Plaintiff Dr. John Maa (hereafter "Plaintiff" or "Dr. Maa"), at all relevant times a surgeon

14  at the UCSF Medical Center and assistant professor at the UCSF School of Medicine, brings the

15  instant action against Dr. Ostroff and ten other top employees of UCSF Medical Center and/or

16  School of Medicine.[1]  In Counts I, II and III of the First Amended Compliant, Plaintiff accuses Dr.

17  Ostroff of violating subsections (A), (B) and (G) of the False Claims Act, 31 U.S.C. § 3729(a)(1),

18  by presenting false claims to Medicare, Medi-Cal and TRICARE, making material false

19  statements and certifications, and using false statement to avoid/conceal obligations to repay

20  fraudulently obtained funds.  In Count IV, Plaintiff also asserts a claim under California Insurance

21  Code § 1871.7(b) based on Dr. Ostroff's alleged presentation of claims to private insurance

22  _____

23          [1] Dr. Joshua Alder is the Chief Medical Officer of UCSF Medical Center; Dr. Nancy
    Ascher is the Chair of the Department of Surgery at UCSF Medical Center; Dr. Susan Desmond-
24  Hellmann is the Chancellor of UCSF; Dr. Adrienne Green is the Associate Chief Medical Officer
    of USCF Medical Center; Dr. Michael Gropper is the President of Medical Staff at UCSF Medical
25  Center, and was previously the Chairman of the Credentials Committee; Dr. Hobart Harris is the
    Chief of General Surgery at UCSF Medical Center; Dr. Sam Hawgood is the Dean of the School
26  of Medicine at UCSF; Mr. Mark Laret is the Chief Executive Officer of the UCSF Medical
    Center; Dr. Sally Marshall is the Vice Provost of the School of Medicine at UCSF; Ms. Susan
27  Penney is the Director of Risk Management at UCSF Medical Center.

28

United States District Court
Northern District of California

1   companies.  In Count V, Plaintiff further asserts a claim arising under 42 U.S.C. § 1983 alleging

2   that all named defendants−with the exception of Dr. Ostroff−retaliated against him for exercising

3   his First Amendment rights.

4          Defendants filed a Motion to Dismiss Plaintiff's First Amended Complaint under Rule

5   12(b)(6) of the Federal Rules of Civil Procedure, and argue that Plaintiff has failed to state a claim

6   arising under the False Claims Act, the California Insurance Code, or asserted any actionable

7   constitutional violation under § 1983.  The Court held a hearing on April 12, 2013.  For the

8   reasons stated below, the Motion to Dismiss is GRANTED and the Compliant is dismissed with

9   leave to amend.[2]

10  **II.      BACKGROUND**

11         **A.      Factual Allegations**

12         Plaintiff worked as a general surgeon at UCSF Medical Center and as an assistant

13  professor in general surgery at the UCSF School of Medicine.  Dkt. No. 13 (First Amended

14  Complaint) ("FAC") ¶ 11.  Plaintiff alleges that after he engaged in protected speech regarding the

15  true cause of death of a former patient, "Jane Doe," all of the Defendants in this action−with the

16  exception of Dr. Ostroff−retaliated against him by constructively denying him tenure.  *Id*. ¶¶ 177-

17  224.  Plaintiff also alleges that the cause of Jane Doe's death was caused, at least in part, by Dr.

18  Ostroff's failure to abide by regulations required for Medicare reimbursement.  *Id*. ¶¶ 92-176.  The

19  alleged regulatory violations committed by Dr. Ostroff form the basis for Plaintiff's *qui tam* action

20  under the False Claims Act.

21                      1.      The Death of Jane Doe

22         Defendant Dr. Ostroff is a gastroenterologist and directs the Endoscopy unit and

23  Gastrointestinal Consultation Service at USCF Medical Center.  FAC ¶ 13.  On March 1, 2008,

24  Jane Doe underwent an Endoscopic Retrograde Cholangiopancreatography ("ERCP") performed

25  by Dr. Ostroff.  *Id*. ¶ 73.  Plaintiff describes an ERCP as a procedure that permits a physician to

26  examine the ducts that drain a patient's liver, gallbladder and pancreas through the insertion of an

27  _____

28         [2] The parties have consented to the jurisdiction of the undersigned magistrate judge
pursuant to 28 U.C.S. § 636(c).

United States District Court
Northern District of California

1    endoscope into the patient's body from the mouth.  *Id.* ¶¶ 56-57.  An ERCP typically requires a

2    minimum of twenty or thirty minutes to perform, but may last as long as two hours.  *Id.* ¶ 58.

3            The organs that an endoscope passes through during an ERCP are quite fragile, so patients

4    who undergo these procedures are giving sedative drugs to place them in a state of "moderate" to

5    "deep" sedation.  FAC ¶ 65.  Before the procedure began, Jane Doe was placed into a state of deep

6    sedation by a "sedation nurse" named Donna Hayes.  FAC ¶ 74.  Plaintiff alleges that Donna

7    Hayes has the equivalent of an associates' degree in general nursing and has only received on-the-

8    job training in anesthesia.  *Id.* ¶ 102.  Thus, if she is an "anesthesiologist's assistant" as defined by

9    42 C.F.R. § 410.69(b)—and Plaintiff alleges she is not, *see* FAC ¶ 101—she may only perform

10   anesthesia services "under the supervision of an anesthesiologist who is immediately available if

11   needed."  42 C.F.R. § 482.52(a); FAC ¶¶ 100-03.

12           Plaintiff alleges that consistent with the standard practice of Dr. Ostroff and other

13   physicians at the UCSF Medical Center, Nurse Hayes was not supervised by an anesthesiologist as

14   required by 42 C.F.R. § 482.52(a)(5).  FAC ¶ 76.  During the ERCP, Nurse Hayes was unable to

15   keep Patient Doe in a state of deep sedation, which caused Patient Doe to experience significant

16   discomfort when the endoscope was inserted into her throat.  She began moaning and thrashing

17   around on the examination table to the extent that she dislodged the IV from her arm and she had

18   to be restrained.  *Id.* ¶ 77.  Plaintiff asserts that improper sedation and movement by the patient

19   during an endoscopic procedure greatly increases the risk of complications and makes it more

20   difficult to properly perform the procedure.  *Id.* ¶ 78.  Plaintiff believes that as a result of the

21   improper sedation, Dr. Ostroff may have terminated the ERCP without completing his

22   examination, but nevertheless claimed that the ERCP had been completed and had revealed

23   nothing to explain her symptoms.  *Id.* ¶¶ 79, 80.

24           After the ERCP, Patient Doe developed pancreatitis and tests revealed elevated liver

25   function.  *Id.* ¶ 81.  Dr. Ostroff recommended that she undergo a second ERCP to place a stent to

26   ensure there was no blockage of the bile duct to her liver.  *Id.*  Five days after her first ERCP,

27   Patient Doe took Dr. Ostroff's advice and underwent a second ERCP.  *Id.* ¶ 82.

28           During this second ERCP procedure, Patient Doe was placed into deep sedation by a

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1   sedation nurse named Foster Steele, who, like Nurse Hayes, was a sedation nurse who was not

2   supervised by an anesthesiologist in accordance with 42 C.F.R. § 482.52(a)(5).  FAC ¶¶ 83, 100-

3   03.  At some point during this second ERCP, Patient Doe stopped getting oxygen, possibly due to

4   receiving a very large dose of the powerful opiate Fentanyl, and eventually went into cardiac

5   arrest.  *Id.* ¶ 84.  About ten minutes before the cardiac arrest began, an alarm went off on an

6   oxygen monitor indicating that the oxygen level of Patient Doe's blood had dropped to dangerous

7   levels.  Rather than summon an anesthesiologist, Nurse Steele assumed that the oxygen sensor was

8   malfunctioning and decided to change to a different oxygen monitor.  *Id.* ¶ 85.

9          The radiology technician, Diana Johnson, believed that something was wrong, so called in

10   Nurse Hayes to assist.  Nurse Hayes helped Nurse Steele hook up a second monitor.  *Id.* ¶ 86.

11   This second monitor initially registered normal oxygen readings, but then it too began to record

12   low oxygen.  At this time, Patient Doe began to go into cardiac arrest and Nurse Steele called

13   "Code Blue," summoning an anesthesiologist and other physicians to assist.  *Id.* ¶ 87.  While

14   waiting for the Code Blue team to arrive, Dr. Ostroff began performing CPR on Patient Doe.  *Id.* ¶

15   88.  By the time the Code Blue team arrived, including Plaintiff, Patient Doe had likely been

16   without oxygen for more than ten minutes.  *Id.* ¶ 89.  Dr. Maa and the Code Blue team managed to

17   stabilize Patient Doe's vitals, but after so long without oxygen, Patient Doe was almost entirely

18   brain dead.  *Id.*

19                     2.          Plaintiff's Investigative Report

20          Plaintiff alleges that he closely followed the investigation into the cause of Patient Doe's

21   death.  FAC ¶ 185.  In his capacity as Patient Doe's physician and the Vice Chair of the UCSF

22   Department of Surgery Quality Improvement Program, Plaintiff also reviewed the documentation

23   that had been done during and after Patient Doe's ERCP and wrote a Quality Improvement Report

24   regarding his findings.  *Id.*  In that report, he concluded that Patient Doe had likely died as a result

25   of "Management – sedation and monitoring," i.e. errors in the administration of anesthetic drugs.

26   *Id.*  Plaintiff alleges that he explored every reasonable explanation of the sudden unexplained

27   cardiopulmonary arrest during the ERCP and spoke with many of his colleagues to exclude all

28   other possible explanations of the event.  *Id.* ¶ 186. In the end, Dr. Maa concluded that the only

4

1    reasonable explanation for Patient Doe's death was inadequate monitoring and likely oversedation

2    at the time of the second ERCP.  *Id.*

3            The San Francisco Medical Examiner, after a nearly year-long investigation, concluded

4    that Patient Doe's death was an "accident" caused by "therapeutic complications" of the ERCP.

5    FAC ¶ 187.  The UCSF Medical Center found that the cause of Patient Doe's death was

6    "inconclusive."  *Id.* ¶ 189.  Plaintiff alleges that Defendants suppressed and ignored the Quality

7    Improvement Report, which had found that Patient Doe had likely died as a result of

8    "Management – sedation and monitoring."  *Id.*

9                       3.      Plaintiff's Participation in the Patient Doe Lawsuit

10           In March of 2009, Patient Doe's husband and family filed a complaint in the Superior

11   Court of the State of California for damages against the Regents of the University alleging

12   negligence and wrongful death of Patient Doe.  FAC ¶¶ 91, 192.  Plaintiff was identified as

13   witness in the case and was noticed for deposition.  *Id.* ¶¶ 91, 193.  In a meeting in December of

14   2009, Plaintiff explained to Defendants Adler and Penney that he would testify that Patient Doe's

15   death had been an accident caused by oversedation and/or improper monitoring. FAC ¶ 194.

16   Plaintiff asserts that throughout the meeting, Defendants Adler and Penney were antagonistic and

17   hostile towards Dr. Maa.  *Id.* ¶ 195.  Subsequently, Defendant Penney began making disparaging

18   comments about Dr. Maa to his peers, supervisors and other Defendants named in this action.  *Id.*

19   ¶ 197.  According to Plaintiff, Defendant Penney repeatedly attacked his character and loyalty and

20   accused him of playing "cloak and dagger" with evidence.  *Id.*

21           On or about January 27, 2010, Defendant Penney informed Plaintiff that he was being

22   "separated" from the other healthcare providers who would be witnesses in the Patient Doe case,

23   and that he had a "very different perspective" than the other doctors.  FAC ¶ 198.  Plaintiff was

24   informed that the Medical Center would provide him with counsel that would help him prepare for

25   his deposition, and if he did not like the attorney chosen by the Medical Center, he would have to

26   retain a different one at his own expense.  *Id.*  Shortly thereafter, Defendant Penney met with

27   Defendant Nancy Ascher, the Chair of the Department of Surgery and one of Dr. Maa's

28   supervisors.  *Id.* ¶ 199.  Defendant Ascher told Plaintiff that Defendant Penney had said Plaintiff

United States District Court
Northern District of California

United States District Court
Northern District of California

was "the problem" with the defense of the Patient Doe litigation, and if Plaintiff did not choose one of the attorneys selected for him by the Medical Center, things would get "hostile." *Id.*

Plaintiff retained his own attorney, but did not inform the Medical Center that he was seeking outside counsel. FAC ¶ 200. In the weeks before Plaintiff's deposition scheduled for April of 2010, Dr. Maa met with the attorney assigned to him by the Medical Center, as well as his private counsel. *Id.* Plaintiff appeared for deposition in April of 2010 with only the attorney assigned by the Medical Center, however, so as not to risk angering Defendants. *Id.* ¶ 203. The attorney representing Patient Doe's family began the deposition, but barely made it past formalities before the attorney representing the Medical Center adjourned the deposition due to another appointment. *Id.*

Plaintiff alleges that at or about the time of Dr. Maa's deposition, the UCSF Medical Center, through their attorneys, and the named Defendants, were aware of Dr. Maa's expected testimony and that he retained his own attorney to represent him. *Id.* ¶ 204. Before Plaintiff's deposition was scheduled to resume, the Medical Center offered a very large settlement to Plaintiff Doe's family, which they accepted. *Id.* ¶ 205.

### 4. Allegations of Retaliation

Plaintiff alleges that as an Assistant Professor at the UCSF School of Medicine, he was on the tenure-track. FAC ¶ 178. Plaintiff had been recognized by his peers, including Defendant Ascher, who wrote in a letter dated November 9, 2008 that "Dr. Maa is an excellent clinician and teacher. He has been an essential member of the Department of Surgery faculty and the faculty of UCSF as a whole. I am confident that Dr. Maa will be approved for an on-time promotion." *Id.* ¶ 182.

Prior to his deposition for the Patient Doe lawsuit, during the Spring of 2010, Dr. Maa submitted an application for promotion to the position of associate professor, the next step in his tenure-track series. *Id.* ¶ 200. The Medical Center and School of Medicine Promotions Committee never responded to this letter. *Id.*

In July of 2010, months after Plaintiff's deposition, the Risk Management Department at UCSF Medical Center placed a report prepared by Dina O'Reilly in Plaintiff's personal file. FAC

6

¶ 206.  The report, which Plaintiff alleges inaccurately summarized the events leading up to the death of Patient Doe, accused Plaintiff of disclosing protected information and unsubstantiated allegations to unauthorized individuals regarding Patient Doe's case.  *Id*.  The report further stated that Dr. Maa's allegations about the cause of Patient Doe's death became part of the evidence in the case and weakened the Medical Center's ability to defend the lawsuit, and that Dr. Maa's "unpredictability" as a witness contributed to the decision to settle the case.  *Id*.

Plaintiff alleges that it is standard practice of UCSF Medical Center to have each of its physicians apply for reappointment to its staff every two years.  FAC ¶ 208.  During the reappointment process, the applicant submits letters of recommendation from his peers and supervisors and the Credentials Committee of the Medical Center review the applicant's work.  *Id*.  Plaintiff alleges that when he submitted his December 2010 reappointment application, he was contacted by the Credentials Department, and for the first time, was informed of the existence of the July 2010 Risk Management report.  *Id*. ¶ 209.

The Credentials Department asked Plaintiff to explain his involvement with the Patient Doe case and address the issues raised in the report.  FAC ¶ 209.  Plaintiff responded by letter dated December 10, 2010.  In the letter, Plaintiff alleges that he addressed the factual inaccuracies in that report, described his conclusions about the Patient Doe case that differed from the Medical Center's defense, and requested the report be corrected and/or removed from his file.  *Id*.  Plaintiff also expressed concern that the report was put into his file as an attempt to retaliate against him for his role as a witness in the Patient Doe lawsuit.  *Id*.

Plaintiff alleges that many of the Defendants were part of the Credentials Committee meeting of December 14, 2010, and the Executive Medical Board and Governing Body meeting on December 22, 2010, which met and determined not to remove the July 2010 Risk Management report from Plaintiff's file.  FAC ¶ 210.  Plaintiff alleges that instead, they denied Plaintiff's application for the standard two-year reappointment and appointed him for only a single year.  *Id*.  By letter dated January 1, 2011, Dr. Gropper wrote to Dr. Maa (with a copy to Dr. Ascher), stating that the Credentials Committee "thoroughly reviewed your filed including your letter explaining" his position as a witness in the Patient Doe case.  *Id*. ¶ 211.  Plaintiff alleges that Defendant

United States District Court
Northern District of California

1  Gropper informed him that the Committee had based its decision to recommend a one-year

2  appointment because of the issues raised in the recredentialing process related in part to the Patient

3  Doe case. *Id.* Plaintiff asserts that the individuals involved in making the decision to limit

4  Plaintiff's employment to one year include Defendants Adler, Green, Penney, Ascher, Desmond-

5  Hellman, Hawgood, Harris, Gropper, and Marshall. *Id.* ¶ 210.

6  On January 19, 2011, Plaintiff wrote a letter to the Risk Management Department,

7  attaching a copy of his December 10, 2010 letter, and inquiring whether the July 2010 report had

8  been either corrected or removed from his file. FAC ¶ 210. Dr. Maa also stated in his January 19,

9  2011 letter that "the final report of the San Francisco Medical Examiner's Office concluded that

10  the death of this patient was an accident, resulting from therapeutic complications after the repeat

11  ERCP performed on March 26th, 2008." *Id.* Plaintiff alleges that he also wrote to Defendants

12  Laret, Hawgood, Adler, Gropper, individually, asking that Patient Doe's case be reviewed in light

13  of the failure on the part of the Medical Center to properly handle the matter. *Id.* Defendant

14  Desmond-Hellman responded on March 9, 2011, stating that it considered the Patient Doe case to

15  be resolved and that no further investigation or review was warranted. *Id.*

16  In November of 2011, Plaintiff again applied for a two-year appointment. FAC ¶ 215. On

17  December 7, 2011, Dr. Maa, through counsel, presented a letter to Defendants Adler and Laret

18  informing them that Dr. Maa had "contacted the Attorney General of the State of California and

19  federal officials to report violations of state and federal laws that pose a serious danger to the

20  public health, as well as violations of the Federal False Claims Act… the California False Claims

21  Act… and the California Insurance Frauds Prevention Act" related to fraudulent billing to

22  Medicare, Medi-Cal, and private insurance. *Id.* ¶ 216. In addition, Dr. Maa's counsel informed

23  Defendants Adler and Laret, on behalf of Dr. Maa, that they were disclosing to state and federal

24  authorities other violations of state and health and safety laws. *Id.* The letter also referred to some

25  of Dr. Maa's prior internal reports about some of these matters. *Id.*

26  Plaintiff alleges that in response to the December 7, 2011 letter, the Medical Center's Chief

27  Campus Counsel, Marcia Canning, responded by letter dated December 22, 2011 that she had

28  reviewed Dr. Maa's prior written communications with various UCSF leaders and there was no

indication of Dr. Maa raising any concerns about billing practices. FAC ¶ 217.  Ms. Canning also wrote that "there is nothing more we can do to follow up."  *Id*.  Additionally, Plaintiff alleges that he was informed—presumably by the same letter—of the decision to again appoint him for only a single year on the basis of his "unprofessional conduct."  *Id*.  Plaintiff asserts that the individuals involved in making this second denial of a two-year appointment include Defendants Green, Penney, Ascher, Desmond-Hellman, Hawgood, Harris, Gropper, and Marshall. *Id.*

Plaintiff alleges that sometime during this course of events, the Medical Center referred him to the Committee on Professionalism because of Defendants' accusations that he discussed confidential and protected information about Patient Doe's case with unauthorized individuals. FAC ¶ 218.  Plaintiff asserts that he never provided any confidential or protected information to anyone who was not authorized to receive it, including Patient Doe's family.  *Id*.

In February of 2012, Plaintiff submitted an application for promotion to the position of associate professor, the next step in his tenure-track series.  FAC ¶ 219.  Plaintiff alleges that in April of 2012, Dr. Nancy Ascher, Chair of the Department of Surgery, and Dr. Hobart Harris, Chief of General Surgery, responded to Plaintiff's application by calling Plaintiff into meeting.  In that meeting, they informed Plaintiff that he would not be promoted from his current position and that the only way for him to stay employed with the UCSF Medical Center was for him to leave the tenure-track series and accept a non-tenure-track position as an adjunct professor.  *Id*.  Plaintiff alleges that the individual involved in making this decision were Defendants Adler, Laret, Green, Penney, Ascher, Desmond-Hellman, Hawgood, Harris, Gropper and Marshall.  *Id.* ¶ 220.

Plaintiff accepted the adjunct position under pressure of removal.  FAC ¶ 219.  The salary for the adjunct position is approximately 46% less than Plaintiff received as an assistant professor. *Id*. ¶ 221.  Plaintiff asserts that after one year as an adjunct, Dr. Maa will no longer receive any salary, as he will be expected to generate his own income from outside grants and other funding. *Id*.

Plaintiff asserts that his acceptance of the adjunct position was the result of a constructive discharge from his tenure track position, and that his constructive discharge has damaged his reputation and career.  FAC ¶¶ 219, 221.  Several patients have cancelled surgeries with Dr. Maa

1    because of negative comments spread by Defendants.  *Id*.  He has been denied committee

2    appointments and leadership roles on those committees, been denied support for intramural

3    research grant funding, and has had to relinquish teaching opportunities with medical students.  *Id*.

4    Plaintiff further alleges that he has listened to disparaging comments made about him in

5    conferences, the operating room, and in emails by the Emergency Department providers.  *Id.*

6                    5.    <u>Allegations of Regulatory Violations</u>

7         In his First Amended Complaint, Plaintiff accuses Dr. Ostroff−the physician who

8    performed the ERCP on Patient Doe−of consistently violating regulations required for Medicare

9    reimbursement.  Plaintiff asserts that these regulatory violations place patient health in danger, and

10   contributed to the death of Patient Doe.  The alleged regulatory violations can be divided into

11   three categories: (i) the use of sedation nurses to perform anesthesia services without supervision;

12   (ii) the billing for endoscopic procedures not performed or supervised by a physician; and (iii) the

13   billing for redundant and unnecessary procedures.

14                     i.    *Use of Sedation Nurse to Perform Anesthesia Services without*
                            *Supervision*
15

16        There are several Medicare regulations governing the conditions of participation for

17   hospitals.  *See* 42 C.F.R. § 482 *et seq*.  One regulation identifies who is qualified to perform

18   anesthesia services.  *See id.* § 482.52; FAC ¶ 94.  The regulation states five categories of persons

19   who may administer anesthesia services: "(1) a qualified anesthesiologist; (2) a doctor of medicine

20   or osteopathy (other than an anesthesiologist); (3) A dentist, oral surgeon, or podiatrist who is

21   qualified to administer anesthesia under State law; (4) A certified registered nurse anesthetist

22   (CRNA) . . . [who] is under the supervision of the operating practitioner or of an anesthesiologist

23   who is immediately available if needed; or (5) An anesthesiologist's assistant . . . who is under the

24   supervision of an anesthesiologist who is immediately available if needed."  4 2 C.F.R. §§

25   482.52(a).

26        Plaintiff alleges that at the time of Patient Doe's death, it was the standard practice of Dr.

27   Ostroff and other physicians at the UCSF Medical Center to use a "sedation nurse."  FAC ¶ 99.

28   Plaintiff alleges that Dr. Ostroff exclusively used sedation nurses in more than 80% of his

United States District Court
Northern District of California

procedures.  *Id*. ¶ 109.  Plaintiff describes a "sedation nurse" as a registered nurse with on-the-job training in the use of sedation drugs who administers deep sedation and performs the monitored anesthesia care on most patients undergoing an ERCP or other similar endoscopic procedures.  *Id*. ¶ 99.  Foster Steele and Donna Hayes are two of the five sedation nurses who administer deep sedation for Dr. Ostroff.  *Id*. ¶ 99.

Plaintiff asserts that "sedation nurses" at UCSF Medical Center are not one of the five practitioners qualified to administer deep sedation, as they are not one of the listed practitioners listed in 42 C.F.R. § 482.52(a).  FAC ¶¶ 100-01.  Plaintiff notes that to work as an "anesthesiologist's assistant," one must be "a graduate of a medical school-based anesthesiologist's assistant education program that—(A) Is accredited by the Committee on Allied Health Education and Accreditation; and (B) Includes approximately two years of specialized basic science and clinical education in anesthesia at a level that builds on a premedial undergraduate science background."  *Id*. (quoting 42 C.F.R. § 410.69(b)(3)).  Plaintiff alleges that neither Nurse Hayes nor Nurse Steel meet this standard because they only have the equivalent of an associate's degree in general nursing and neither have had formal medical school training in anesthesia, nor have they graduated from a formal "medical school-based anesthesiologist's assistant educational program," but rather received on-the-job training.  *Id*. ¶ 102.

Plaintiff alleges that even if sedation nurses were "anesthesiologist's assistants," Dr. Ostroff and other physicians would still not be in regulatory compliance because the sedation nurses are not "under the supervision of an anesthesiologist who is immediately available if needed."  42 C.F.R. §§ 482.52(a); FAC ¶ 103.  Plaintiff notes that the Center for Medicare and Medicaid Services ("CMS") Interpretative Guidelines explain for a supervising anesthesiologist to be immediately available, he or she must be:

> • Physically located within the operative suite or in the labor and delivery unit;
> • Prepared to immediately conduct hands-on intervention if needed; and
> • Not engaged in activities that could prevent the supervising practitioner from being able to immediately intervene and conduct hands-on interventions if needed.

United States District Court
Northern District of California

1   FAC ¶ 104.  Plaintiff asserts that while there is "oftentimes" an anesthesiologist in an adjacent

2   room performing or preparing anesthesia, these doctors are not "immediately available" as they

3   are in the midst of their own procedures and are therefore "engaged in activities that could prevent

4   the supervising practitioner from being able to immediately intervene and conduct hands-on

5   interventions if needed."  *Id.* ¶ 107.  Plaintiff also notes that Dr. Ostroff is not an anesthesiologist

6   and, even if he were, he could not be "immediately available" if he is administering an endoscopic

7   procedures such as an ERCP, or other endoscopic procedures such as an

8   Esophagogastroduodenoscopy ("EGD"), or colonoscopy.  *Id.* ¶ 106.

9        Plaintiff alleges that Dr. Ostroff and the other gastroenterologists who perform endoscopic

10   procedures on deeply sedated patients at the UCSF Medical Center collectively perform thousands

11   of procedures on patients covered by Medicare, Medi-Cal, and other government and private

12   insurance.  FAC ¶ 110.  Plaintiff notes that the Medical Center permits other departments, such as

13   radiology—which shares sedation nurses with the gastroenterology department—to use sedation

14   nurses to administer deep sedation to patients.  *Id.* ¶ 111.  Plaintiff argues that as a result, Dr.

15   Ostroff and others presented, or caused others to present, false claims and made, or caused others

16   to make, material false statements to Medicare, Medi-Cal and other government and private

17   insurance programs for procedures involving deep sedation administered by unsupervised sedation

18   nurses, on an ongoing and continuing basis.  *Id.* ¶¶ 110, 114.

19            ii.      *Billing for Endoscopic Procedures Not Performed or Supervised by*

20                     *a Physician*

21        The requirements for billing procedures carried out by residents are described in 42 C.F.R.

22   § 415.172(a).  *See also* FAC ¶ 115.  The general rule is that "[i]f a resident participates in a service

23   furnished in a teaching setting, [the] physician fee schedule payment is made only if a teaching

24   physician is present during the key portion of any service or procedure for which payment is

25   sought."  42 C.F.R. § 415.172(a).  "In the case of surgical, high-risk, or other complex procedures,

26   the teaching physician must be present during all critical portions of the procedure and

27   immediately available to furnish services during the entire service or procedure."  *Id.* §

28

415.172(a)(1). "In the case of procedures performed through an endoscope, the teaching physician must be present during the *entire viewing*." *Id.* § 415.172(a)(1)(i) (emphasis added).

Plaintiff alleges that for an EGD, an endoscope is in a patient's body for as little time as five minutes, but for ERCPs and colonoscopies, the procedure typically requires a minimum of 15-30 minutes, and can take up to an hour to perform. FAC ¶ 116. Plaintiff asserts that Dr. Ostroff typically books a room for an hour, which is consistent with the usual time that these procedures should require. *Id.* ¶ 120. However, Dr. Ostroff regularly schedules up to five simultaneous endoscopic procedures in five different rooms. *Id.* ¶ 121. Plaintiff provides as an example Dr. Ostroff's schedule on May 3, 2002:

> Dr. Ostroff scheduled two colonoscopies, an EGD, and an ERCP in four different rooms in the 8:00am - 9:00am block. He then scheduled two more colonoscopies and another EGD from 9:00am-10:00am, another ERCP from 9:30am-10:30am, three more EGDs and a colonoscopy from 10:00am-11:00am, another ERCP from 10:30am-11:30am, three more colonoscopies and an EGD from 11:00am-12:00am, another ERCP from 11:30am-12:30pm, an EGD and a colonoscopy from 12:00pm-1:00pm, and three more ERCPs at 12:30pm, 1:30pm, and 2:30pm.

*Id.* ¶ 122. Similarly, on January 13, 2006, Dr. Ostroff scheduled five EDGs, six colonoscopies, and six ERCPs, in three different rooms during the six hour block from 8:00am to 2:00pm. *Id.* ¶ 126. Plaintiff further alleges that this simultaneous scheduling has continued to the present. *Id.* ¶ 128.

Plaintiff asserts that even if each procedure took only the minimum possible time to perform, it would not be possible for Dr. Ostroff to personally perform each of these procedures. *Id.* ¶ 121. Plaintiff states that ten colonoscopies, seven EGDs, and seven ERCPs—what Dr. Ostoff scheduled on May 3, 2002—should have taken Dr. Ostroff an average of more than ten hours to perform, plus additional time to meet with the patients, supervise the initial administration of sedation drugs, and wash his hands. *Id.* ¶ 126. Plaintiff asserts that the only way for Dr. Ostroff to perform all of these procedures would be for him to allow unsupervised residents to perform most of the procedures, while he is away working on other patients. *Id.* ¶ 125. Plaintiff asserts that these simultaneous procedures are not medically safe. *Id.* ¶ 127.

iii.     *The Billing for Redundant and Unnecessary Procedures*

Plaintiff also alleges that Dr. Ostroff bills for redundant and unnecessary procedures in violation of 42 U.S.C. § 1395y(a)(1)(A).   Plaintiff alleges that Dr. Ostroff routinely schedules ERCPs and other endoscopic procedures for patients who have no clinical need to have them done, and in fact, often performs large numbers of procedures on the same patient.  FAC ¶ 131.  In the First Amended Complaint, Plaintiff provides as examples the records of Patients A, B, C, D, E, and F.

- Patient A, a Medicare patient, underwent at least 10 ERCPs in just two years, from 2008-10.  Dr. Ostroff performed ERCPs on Patient A on or about the following dates: June 1, 2009; June 15, 2009; July 29, 2009; and November 30, 2009.

- Patient B, a privately insured patient, underwent at least 20 endoscopic procedures from 2003 to 2011, including 18 ERCPs.  Dr. Ostroff performed ERCPs on Patient B on or about the following dates: November 10, 2008; December 1, 2008; January 12, 2008; and February 19, 2008.

- Patient C, a Medicare patient, underwent at least 19 ERCPs from 2002 to 2011.  Dr. Ostroff performed ERCPs on Patient C on or about May 20, 2011 and October 12, 2011.

- Patient D, a privately insured patient, underwent at least 10 ERCPs in three years, from 2009 to 2012.  Dr. Ostroff performed ERCPs on Patient D on or about February 22, 2010; April 5, 2010; and July 26, 2010.

- Patient E, whose type of insurance is unknown, underwent at least 25 ERCPs in four years, from 2002 to 2006.  Dr. Ostroff performed ERCPs on Patient E on or about August 6, 2003; August 20, 2003; September 3 and 17, 2003; and October 7, 2003.

- Patient F, a privately insured patient, underwent at least five ERCPs in just six months in 2009 to 2010.  Dr. Ostroff performed ERCPs on Patient E on or about April 16, 2009; July 29, 2009; September 17, 2009; and September 24, 2009.

FAC ¶¶ 132-37.

Plaintiff alleges that for each of the patients, the foregoing procedures detected nothing out of the ordinary and were apparently done as routine monitoring or check-ups and were completely unnecessary.  *Id.*  Plaintiff further asserts that most of the procedures involved the improper use of a sedation nurse to administer monitored anesthesia care.  *Id.*  Therefore, Plaintiff concludes that

14

as a result of performing these unnecessary and redundant procedures, Dr. Ostroff presented, and caused the UCSF Medical Center to present, false claims and false certifications to Medicare, Medi-Cal and private insurance. *Id.*

\*       \*       \*

Plaintiff asserts that the foregoing regulatory violations are actionable under the FCA because Dr. Ostroff and the UCSF Medical Center make certifications that they comply with all applicable regulations to receive payment on their claims.  Plaintiff explains that providers who wish to be eligible to participate in Medicare Part A must periodically submit an application to participate in the program.  FAC ¶ 144.  The application contains a certification statement that states:  "I agree to abide by the Medicare laws, regulations and program instructions … and on the provider's compliance with all applicable conditions of participation in Medicare." *Id.*

Plaintiff further alleges that each physician at UCSF Medical Center must periodically submit an application to renew his or her clinical privileges to practice medicine at that facility. FAC ¶ 145.  Each application contains a Medicare Notice that states: "Anyone who misrepresents, falsifies, or conceals essential information required for payment of Federal funds may be subject to fine, imprisonment, or civil penalty under applicable Federal laws." *Id.*  Plaintiff alleges that Dr. Ostroff and each of the physicians at UCSF Medical Center must sign this form and make the following certification: "By my signature below, I acknowledge that I have read and agree to be bound by all of the above information, including Medicare Notice." *Id.*

Plaintiff alleges that UCSF Medical Center makes further certifications in its hospital cost report that is submitted to Medicare annually.  FAC ¶ 153.  UCSF Medical Center's responsible provider official is required to certify, and did certify that:

> [T]o the best of my knowledge and belief, [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.  I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

*Id.* ¶ 154.  Finally, Plaintiff alleges that as part of an unlawful scheme to defraud Medicare, Medicaid and TRICARE, Dr. Ostroff and other physicians knowingly caused the Medical Center

1    to make false certifications, or acted in deliberate ignorance or reckless disregard that such claims

2    were false.  *Id*. ¶¶ 161-62.

3         **B.     Defendants' Motion to Dismiss**

4         Defendants filed a Motion to Dismiss Plaintiff's First Amended Complaint in its entirety.

5    Dkt. No. 29 (Defendants' Motion to Dismiss For Failure to State a Claim under Rule 12(b)(6); and

6    on the Basis of Qualified Immunity) ("Motion").  Defendants argue that Plaintiff has failed to state

7    a claim giving rise to liability under the False Claims Act.  Defendants contend that Plaintiff's

8    allegations regarding the improper use of sedation nurses to perform anesthetic services is a

9    condition of participation, and the Ninth Circuit has already held that conditions of participation

10   are not actionable under the False Claims Act.  Motion at 4 (citing *Ebeid ex rel. United States v.*

11   *Lungwitz*, 616 F.3d 993 (9th Cir. 2010) ("*Ebeid*")).  Defendants argue that that certifications made

12   in the annual hospital cost reports also pertain to non-actionable conditions of participation, and

13   further argue that this allegation should fail as it is merely derivative of Plaintiff's other non-

14   actionable allegations.

15        Regarding the allegation that Dr. Ostroff and other physicians fail to properly perform or

16   supervise endoscopic procedures, Defendants argue that Plaintiff's allegations do not establish that

17   Dr. Ostroff has actually violated the relevant regulations, and in any event, this is a standard of

18   care claim in disguise, which the Ninth Circuit has held is not actionable.  Motion at 7 (citing

19   *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006)

20   ("*Hendow*")).  Defendants further argue that Plaintiff's claim under the California Insurance Code

21   fails because the regulations which Dr. Ostroff allegedly violated do not apply to reimbursement

22   from private insurance companies.  Finally, Defendants contend that Plaintiff's allegations do not

23   satisfy Rule 9(b)'s heightened pleading standards for a claim under the False Claims Act, as

24   Plaintiff did not identify any particular claim that was fraudulently submitted to Medicare or

25   explain why any of the alleged unnecessary procedures were in fact unnecessary.

26        Defendants argue that Plaintiff's § 1983 claim regarding retaliation in violation of

27   Plaintiff's First Amendment rights should be dismissed because Plaintiff fails to satisfy the

28   elements of a First Amendment retaliation claim, and in any event, Defendants are entitled to

United States District Court
Northern District of California

16

qualified immunity because any rights allegedly violated were not clearly established at the time of the alleged wrongdoing.  Specifically, Defendants argue that Plaintiff's alleged speech−consisting of his investigative report and communications regarding the investigative report−was speech that falls within the scope of Plaintiff's official job duties, and is therefore not covered by the First Amendment.  Defendants further contend that Plaintiff fails to explain how each individual defendant was an "integral participant" in the alleged retaliation, and fails to allege how each individual defendant was motivated by Plaintiff's alleged speech to take any adverse action.

### C.    Plaintiff's Opposition

Plaintiff filed an Opposition to Defendants' Motion to Dismiss challenging each the foregoing arguments.  Dkt. No. 35 (Plaintiff's Opposition to Motion to Dismiss) ("Opp."). Plaintiff argues that the allegations in the First Amended Complaint demonstrate a cognizable claim under the False Claims Act under the factually false theory, and the theory of implied false certification, both express and implied.  Plaintiff contends that Defendants misread the Ninth Circuit's holding in *Ebeid*, because the court expressly did not decide that conditions of participation are not actionable under the False Claims Act.  In any event, Plaintiff contends that all of the alleged regulatory violations cited by Plaintiff are part of the over-billing scheme which relates directly to Plaintiff's allegations of unnecessary medical procedures, which is a condition of payment as opposed to a condition of participation.  Plaintiff also argues that his allegations comprise a claim under the California Insurance Code, which similarly requires that claims for reimbursement to private insurance companies be medically necessary.  Finally, Plaintiff argues that his allegations meet Rule 9(b)'s heightened pleading standards for claims under the False Claims Act as described by the Ninth Circuit in *Ebeid*.

Plaintiff also argues that his allegations comprise a claim for retaliation in violation of the First Amendment, and that Defendants are not entitled to qualified immunity because his constitutional rights were clearly established when violated.  Plaintiff argues that he engaged in protected speech that was not within the scope of his job when he planned to testify as to the true cause of Patient Doe's death in response to a subpoena in wrongful death lawsuit, and when he

United States District Court
Northern District of California

17

1    continued to insist after writing the investigative report that Defendants recognize the cause of

2    Patient Doe's death as inadequate monitoring of anesthetic services and oversedation.  Plaintiff

3    also argues that he need not allege how each individual defendant was an "integral participant" in

4    the retaliation, and that he sufficiently alleges each defendant's "personal participation" in the

5    retaliation.

6    **III.    LEGAL STANDARD**

7           A complaint may be dismissed for failure to state a claim for which relief can be granted

8    under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Fed.R.Civ.P. 12(b)(6).  "The

9    purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the

10   complaint." *N. Star. Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  In ruling on

11   a motion to dismiss under Rule 12(b)(6), the Court takes "all allegations of material fact as true

12   and construe(s) them in the lights most favorable to the non-moving party." *Parks Sch. of Bus. v.*

13   *Symington*, 51 F.3d 1480, 1484 (9th Cir. 1990).

14          Generally, the plaintiff's burden at the pleading stage is relatively light.  Rule 8(a) requires

15   a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R.

16   Civ. P. 8(a)(2).  The complaint need not contain "detailed factual allegations," but must allege

17   facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S.

18   662, 663 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  The factual

19   allegations must be definite enough to "raise a right to relief above the speculative level on the

20   assumption that all of the complaint's allegations are true." *Twombly*, 550 U.S. at 545.  "[T]he

21   tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals

22   of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at

23   663.

24   **IV.    DISCUSSION**

25          **A.    False Claims Act**

26          The False Claims Act ("FCA") "was enacted during the Civil War with the purpose of

27   forfending widespread fraud by government contractors who were submitting inflated invoices

28   and shipping faulty goods to the government." *United States ex rel. Hopper v. Anton*, 91 F.3d

United States District Court
Northern District of California

18

1261, 1266 (9th Cir. 1996) ("*Hopper*").  "To encourage insiders to disclose fraud and thereby

bolster enforcement, the FCA contains a *qui tam* provision that permits private persons (known as

'relators') to bring civil actions on behalf of the United States and claim a portion of any award."

*Ebeid*, 616 F.3d at 995 (citing 31 U.S.C. § 3730(b), (d) (2008)).

   The False Claims Act makes liable anyone who "knowingly presents, or causes to be

presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or

"knowingly makes, uses, or causes to be made or used, a false record or statement material to a

false or fraudulent claim," *id*. § 3729(a)(1)(B).  A person is also liable who "knowingly makes,

uses, or causes to be made or used, a false record or statement material to an obligation to pay or

transmit money or property to the Government, or knowingly conceals or knowingly and

improperly avoids or decreases an obligation to pay or transmit money or property to the

Government."  *Id*. § 3729(a)(1)(G).  A person acts "knowingly" if that person "(i) has actual

knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the

information; or (iii) acts in reckless disregard of the truth or falsity of the information."  *Id.* §

3729(b)(1)(A).  The term "knowingly" requires "no proof of specific intent to defraud."  *Id*. §

3729(b)(1)(B).

   The Ninth Circuit has explained that the "archetypal *qui tam* False Claims Action" is one

in which "a private company overcharges under a government contract, [and] the claim for

payment itself is literally false or fraudulent."  *Hendow*, 461 F.3d at 1170 (citing *Hopper*, 91 F.3d

at 1266).  "The False Claims Act, however, is not limited to such facially false or fraudulent

claims for payment."  *Hendow*, 461 F.2d at 1170.  "Rather, the False Claims Act is intended to

reach all types of fraud, without qualification, that might result in financial loss to the

Government."  *Id.* (citing *United States v. Neifert-White Co*., 390 U.S. 228, 232 (1968)).  "[E]ach

and every claim submitted under a contract, loan guarantee, or other agreement which was

originally obtained by means of false statements or other corrupt or fraudulent conduct, or in

violation of any statute or applicable regulation, constitutes a false claim."  *Hendow*, 461 F.2d at

1170-71 (quoting S.Rep. No. 99-345, at 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274).

   Therefore, in addition to the "archetypal" FCA claim, the Ninth Circuit recognizes "false

certification" claims arising under the FCA "where a party merely falsely certifies compliance with a statute or regulation as a condition to the government payment." *Hendow*, 461 F.3d at 1171.  The four requisite elements of a FCA claim based on the theory of false certification are: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Hendow*, 461 F.3d at 1174.  In *Ebeid*, the Ninth Circuit explained that a FCA claim based on the theory of false certification may be either express or implied:

> Express certification simply means that the entity seeking payment certifies compliance with a law, rule or regulation as part of the process through which the claim for payment is submitted.
>
> Implied false certification occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim.

*Ebeid*, 616 F.3d at 998.

The Ninth Circuit first discussed FCA claims based on a false certification theory in *Hopper*, where the court affirmed summary judgment in favor of a defendant school district. *Hopper*, 91 F.3d at 1267.  The basis of the FCA claim was that the school district violated federal and state regulations and also used federal funds provided through the Individuals with Disabilities Education Act ("IDEA").  *Hopper*, 91 F.3d at 1267.  The court held that there was no actionable FCA claim, however, because the forms on which the claims were submitted did "not contain any certification concerning regulatory compliance," and "the IDEA does not require funding recipients to certify their compliance with federal laws and regulations."  *Id*.  The court stated that "[v]iolations of laws, rules, or regulations alone do not create a cause of action under the FCA.  It is the false *certification* of compliance which creates liability when certification is a prerequisite to obtaining a government benefit."  *Hopper*, 91 F.3d at 1266.

Ten years later, in *Hendow*, the Ninth Circuit recognized a cognizable FCA claim based on the false certification theory.  *Hendow*, 461 F.3d at 1174-78.  The court reversed the district court's dismissal where there were sufficient allegations that the University of Phoenix knowingly

20

1   made promises to comply with an incentive compensation ban in order to become eligible for Title

2   IV funds.

3          In *Ebeid*, the Ninth Circuit explicitly recognized the implied false certification theory in a

4   case where the FCA claim was based allegations that the defendant engaged in unlawful corporate

5   practice of medicine and violated various Medicare regulations. *Ebeid*, 616 F.3d at 999.

6   Nevertheless, the *Ebeid* court affirmed dismissal of the claim for the plaintiff's failure to plead

7   facts with particularity as required by Rule 9(b) of Federal Rules of Civil Procedure. *Ebeid*, 616

8   F.3d at 999.  The court explained that for "a complaint alleging implied false certification," the

9   plaintiff "must plead with particularity the allegations that provide a reasonable basis to infer that

10  (1) the defendant explicitly undertook to comply with a law, rule or regulation that is implicated in

11  submitting a claim for payment and that (2) claims were submitted (3) even though the defendant

12  was not in compliance with the law, rule or regulation." *Ebeid*, 616 F.3d at 998; *see also Cafasso*,

13  637 F.3d at 1055 ("claims of fraud or mistake−including FCA claims−must, in addition to

14  pleading with particularity, also plead plausible allegations").  However, the court declined to

15  adopt the rule from several other circuits that the plaintiff must "identify representative examples

16  of false claims to support every allegation…." *Id.*  Rather, the Ninth Circuit found "that it is

17  sufficient to allege 'particular details of a scheme to submit false claims paired with reliable

18  indicia that lead to a strong inference that claims were actually submitted.'" *Id.* (quoting *United*

19  *States ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).

20         The Court now considers whether Plaintiff's allegations state a FCA claim under the

21  theory of implied false certification which is consistent with the heightened pleading standards as

22  described in *Ebeid*.[3]  The Court will examine Plaintiff's allegations within the framework of the

23  _____

24         [3] Plaintiff also argues that he pleads a FCA claim under the express false certification
    theory and the factually false theory.  "Express certification simply means that the entity seeking
25  payment certifies compliance with a law, rule or regulation as a part of the process through which
    the claim for payment is submitted." *Ebeid*, 616 F.3d at 998.  At no point in his opposition brief
26  does Plaintiff explain how his allegations satisfy the express false certification theory, and
    Plaintiff has not alleged that any certification was made "as part of the process through which the
27  claim for payment is submitted." *Id.*
           The "factually false" theory refers to the "archetypal *qui tam* False Claims Action" in
28  which "a private company overcharges under a government contract, [and] the claim for payment
    itself is literally false or fraudulent." *Hendow*, 461 F.3d at 1170; *see also* 31 U.S.C. §

United States District Court
Northern District of California

four-part test articulated in *Hendow*. Thus, to survive Defendants Motion to Dismiss the FCA claim, Plaintiff must have alleged facts which show "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Hendow*, 461 F.3d at 1174.

        1.   Falsity

      The first element requires a false statement or fraudulent course of conduct. In *Ebeid*, the Ninth Circuit held that a false certification need not be simultaneous or "part of the process through which the claim for payment is submitted." *Ebeid*, 616 F.3d at 998. Rather, "[i]mplied false certification occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim." *Id*.

      Here, Plaintiff alleges that Dr. Ostroff certified or caused UCSF Medical Center to certify compliance with all Medicare laws and regulations, including the conditions of participation, by three means: (1) the periodic application that UCSF Medical Center must submit to participate in Medicare Part A, FAC ¶ 144; (2) Dr. Ostroff's periodic application to renew his privileges to practice medicine at UCSF, *id*. ¶ 145; and (3) UCSF Medical Center's annual hospital cost reports, where it certifies that "the services identified in this cost report were provided in compliance with" the "laws and regulations regarding the provision of health care services," *id*. ¶¶ 153-54. Although the submission of the periodic application for participation in Medicare Part A and the annual hospital cost reports[4] may show that the *UCSF Medical Center* certified compliance with

---

3729(a)(1)(A). Plaintiff argues in his opposition brief that the claims were "literally false because those claims do not meet the specifications of the applicable regulations." Opp. at 6-7 (citing *U.S. v. Mackby*, 261 F.3d 821 (9th Cir. 2001)). However, a claim that implicitly certifies compliance with regulations is not a literally false claim, and Plaintiff has not alleged facts which support a FCA claim based on the factually false theory. The claim in *Mackby* was based on the factually false theory because the provider submitting the claims to Medicare used his father's PIN number, an M.D., who had no connection with the entity providing services. *Mackby*, 261 F.3d at 825. Plaintiff's allegations are not analogous to the facts in *Mackby* because Plaintiff has not alleged a literal deception in any claim submitted. Accordingly, the Court rejects Plaintiff's arguments for FCA liability based on any theory other than the implied false certification theory.

    [4] The Tenth Circuit's decision in *United States ex rel. Conner v. Salina Regional Health*, 543 F.3d 1211 (10th Cir. 2008) ("*Conner*") must be distinguished on this point. The *Conner* court held that certifications in the annual hospital cost report were non-actionable conditions of participation. *See id.* at 1219. However, under the Ninth Circuit's definition of implied false

United States District Court
Northern District of California

United States District Court
Northern District of California

1   all laws and regulations governing Medicare, Plaintiff does not sufficiently allege that *Dr. Ostroff*

2   made such certifications or allege any facts to show that Dr. Ostroff caused the UCSF Medical

3   Center to make them.

4          Plaintiff alleges that Dr. Ostroff, as one of the physicians at UCSF Medical Center, was

5   required to periodically submit an application to renew his clinical privileges wherein he certified

6   that he agrees to be bound by the Medicare Notice. FAC ¶ 145. The Medical Notice states that

7   "[a]nyone who misrepresents, falsifies, or conceals essential information required for payment of

8   Federal funds may be subject to fine, imprisonment, or civil penalty under applicable Federal

9   laws." *Id*. The language of the Medical Notice does not expressly certify compliance with all

10  laws and regulations governing Medicare. Rather, it threatens the imposition of a "fine,

11  imprisonment, or civil penalty" for making false claims. *Id*. Moreover, although the FCA

12  contemplates liability for an individual that "causes" a false certification to be made, Plaintiff has

13  not alleged with any particularity how Dr. Ostroff caused the UCSF Medical Center to make any

14  such certifications. The pleadings must be amended in this regard to satisfy Rule 9(b)'s pleading

15  requirements.

16          2.      Scienter

17          The Ninth Circuit has "emphasized the central importance of the scienter element to

18  liability under the False Claims Act, holding that false claims must in fact be 'false when made.'"

19  *Hendow*, 461 F.3d at 1171-72 (quoting *Hopper*, 91 F.3d at 1267). "A palpably false statement,

20  known to be a lie when it is made, is required for a party to be found liable under the False Claims

21  Act." *Hendow*, 461 F.3d at 1172. In *Hendow*, this element was satisfied because the Plaintiff had

22  alleged that the "University staff openly bragged about perpetrating a fraud, that the University

23  had an established infrastructure to deceive the government, and that the University repeatedly

24  changed its policies to hide its fraud." *Id.* at 1175.

25

26

27
    certification, the annual hospital cost report is not a condition of participation in and of itself, but
28  rather a means by which an entity undertakes to expressly comply with a law, rule or regulation.
    *Ebeid*, 616 F.3d at 998.

Plaintiff alleges that as part of an unlawful scheme to defraud Medicare, Medicaid and TRICARE, Dr. Ostroff knowingly caused the Medical Center to make false certifications, or acted in deliberate ignorance or reckless disregard that such claims were false.  *Id.* ¶¶ 161-62; *see also* 31 U.S.C. § 3729(b)(1)(A).  Although Plaintiff's allegations of scienter are not particularized, Rule 9(b) states that allegations of "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed.R.Civ.P. 9(b).  Therefore, the Court finds Plaintiff's allegations sufficient to satisfy the scienter element at this pleading stage.

### 3.   Materiality

A false statement "must be material to the government's decision to pay out moneys to the claimant."  *Hendow*, 461 F.3d at 1172.  "[T]he relevant certification of compliance must both be a 'prerequisite to obtaining a government benefit,' … and a '*sine qua non* of receipt of [government] funding."  *Id.* (quoting *Hopper*, 91 F.3d at 1266-67).  In *Hendow*, the court found materiality where three different sources−two federal statutes and the program participation agreement−expressly conditioned the receipt of Title IV funds upon compliance with the incentive compensation ban.  *Hendow*, 461 F.3d at 1175-76.  Here, where Plaintiff asserts an FCA claim under the implied theory of false certification, it will be sufficient for Plaintiff to allege facts showing that false certifications "previously undertaken" by Dr. Ostroff were essential to the government's decision to pay the Medicare claim.  *Ebeid*, 616 F.3d at 998.  The Court divides this analysis by the three types of alleged regulatory violations regarding: (i) sedation nurses performing anesthetic services, (ii) inadequate supervision of residents performing endoscopic procedures, and (iii) billing for unnecessary endoscopic procedures.

### i.   *Sedation Nurses Performing Anesthesia Services*

The regulations governing persons qualified to perform anesthesia services are expressly noted as "conditions of participation" in 42 C.F.R. § 482.52.  The parties dispute whether the Ninth Circuit has imposed a categorical rule that conditions of participation, as opposed to conditions of payment, are not actionable under the FCA.  In *Hendow*, while discussing the materiality element of the plaintiff's FCA claim, the court rejected the defendant's argument that there was a payment-participation distinction in the context of Title IV and the Higher Education

United States District Court
Northern District of California

Act.  The court reasoned that the language of the "statutes, regulations and contracts implementing Title IV and the Higher Education Act requirements for funding, quite plainly care about an institution's ongoing conduct, not only its past compliance." *Hendow*, 461 F.3d at 1177.

In so holding, the Ninth Circuit distinguished *Mikes v. Straus*, 274 F.3d 687 (2d. Cir. 2001) ("*Mikes*"), where the Second Circuit had previously held that in the Medicare context, a statutory requirement that the provider "assure" that services meet professionally recognized standards of health care was a prospective condition of participation, which was not actionable under the FCA. *See id*. at 701.  The *Mikes* court distinguished conditions of participation from conditions of payment, holding that "a medical provider should be found to have implicitly certified compliance with a particular rule as a condition of reimbursement … only when the underlying statute or regulation upon which the plaintiff relies *expressly* states the provider must comply in order to be paid."  *Id*. at 700 (emphasis in original).  In *Hendow*, while discussing the *Mikes* case with approval, the Ninth Circuit expressed reservation about the Second Circuit's requirement that the underlying statute expressly condition payment on compliance with that statute.  *Hendow*, 461 F.3d at 1177 ("An explicit statement … is not necessary to make a statutory requirement a condition of payment, and we have never held as much.").

Later, in *Ebied*, the Ninth Circuit expressly declined to decide "whether to adopt the Second Circuit's requirement in the Medicare context that 'the underlying statute expressly condition payment on compliance.'"  *Ebied*, 616 F.3d at 998 n. 3.  After dismissing the plaintiff's claims on Rule 9(b) grounds, the court discussed the plaintiff's three theories of liability under the FCA, and in each instance, mentioned whether the underlying statute expressly conditioned payment upon compliance.  With regard to allegations that the defendant engaged in the corporate practice of medicine, the court noted that the "Second Amended Complaint does not refer to any statute, rule, regulation or contract that conditions payment on compliance," and wrote that instead, the plaintiff "baldly asserts" that nondisclosure of this information was material to the government's decision to pay the claims.  *Id*. at 999-1000.  However, with regard to Plaintiff's other allegations relating to violations of the Stark Act and an express condition of payment governing home health services, the court noted that underlying statutes expressly conditioned

1    payment on compliance and therefore, "may serve as the basis for an implied false certification."

2    *Id*. at 1000-01.

3         The regulation governing persons qualified to perform anesthesia services, 42 C.F.R. §

4    482.52, does not expressly condition payment upon compliance.  The Court finds that while this is

5    not dispositive of materiality, it is evidence of what the government considers to be material when

6    making its decision to pay out Medicare claims.  *See Ebeid*, 616 F.3d at 1000 (discussing whether

7    the underlying statutes expressly condition payment upon compliance); *see also United States v.*

8    *Science Applications Int'l Corp.*, 626 F.3d 1257, 1269 (D.C. Cir. 2010) (the "existence of express

9    … language specifically linking compliance to eligibility for payment may well constitute

10   dispositive evidence of materiality, but it is not … a necessary condition.").  This is especially true

11   in the Medicare context, where statutes regarding the conditions of participation are juxtaposed

12   with statutes which expressly require compliance as a condition of payment.  *Mikes*, 274 F.3d at

13   699-702.

14        Nevertheless, determining whether noncompliance with an underlying statute is material to

15   the government's decision to pay a claim is not based solely on the language of the statute.  There

16   may be other reasons why conditions of participation are or are not material to the government's

17   decision to pay a Medicare claim.  For instance, noncompliance with a condition of participation

18   may be enforced through other administrative mechanisms suggesting that they are not material to

19   payment.  Such noncompliance may be discovered through periodic reviews mandated by

20   Medicare's administrative scheme.  *See* 42 C.F.R. § 488.20.  If the "deficiencies are of such

21   character as to substantially limit the provider's or supplier's capacity to furnish adequate care or

22   which adversely affect the health and safety of patients," a "Certification of Noncompliance" may

23   be issued.  *Id.* § 488.24.  A provider is then "granted a reasonable time to achieve compliance,"

24   which is usually a period of sixty days.  *Id.* § 488.28(c).  *See also Conner*, 543 F.3d at 1221

25   (finding supporting for the conditions of payment-participation distinction "[b]ased on the fact that

26   the government has established a detailed administrative mechanism for managing Medicare

27   participation").

28

United States District Court
Northern District of California

1    Based on the fact that § 482.52 does not expressly condition payment upon compliance,

2    together with the fact that other non-payment administrative means exist to ensure enforcement of

3    Medicare's conditions of participation, the Court finds that non-compliance with 42 C.F.R. §

4    482.52 is not material to the government's decision to pay a claims submitted to Medicare except

5    in one limited circumstance−if the provider bills for specific services prohibited by this section.

6    There is a cognizable claim under the FCA if the claim for reimbursement is for the unqualified

7    sedation nurses to perform the anesthesia services.  This was not pled in the First Amended

8    Complaint.  If, on amendment, Plaintiff can allege that Dr. Ostroff billed for Medicare for such

9    forbidden services−that would be a materially false claim.  Therefore, Plaintiff's allegations of a

10   FCA claim based on violations of 42 C.F.R. § 482.52 are dismissed with leave to amend.

11                    ii.         *Supervision of Residents Performing Endoscopic Procedures*

12   Plaintiff's allegations regarding Dr. Ostroff's inadequate supervision of residents

13   performing endoscopic procedures is based on violations of 42 C.F.R. § 415.172, which governs

14   the "physician fee schedule payment for services of teaching physicians."  *See id.*  Unlike the

15   regulations governing qualified persons to perform anesthesia services, this regulation is not a

16   condition of participation in Medicare, but is rather a condition of payment because a "physician

17   fee schedule payment is made *only if* a teaching physician is present during the key portion of any

18   service or procedure for which payment is sought."  42 C.F.R. § 415.172(a) (emphasis added).

19   For endoscopic procedures, the regulations require the supervising physician to be present for "the

20   entire viewing."  *Id.* § 415.172(a)(1)(i).

21   Defendants argue that Plaintiff's allegations regarding unsupervised residents, even if

22   assumed to be true, fail to show that Dr. Ostroff violated § 415.172 because Plaintiff does not

23   allege that Dr. Ostroff was not present for the "entire viewing" of any endoscopic procedures.

24   Motion at 7.  Defendants are correct.  Plaintiff alleges that "Dr. Ostroff regularly fails to

25   adequately supervise residents during endoscopic procedures," and that Dr. Ostroff regularly

26   performs as many as five simultaneous endoscopic procedures in different rooms, which "is not

27   medically safe and is likely not physically possible."  FAC ¶¶ 117-19.

28

United States District Court
Northern District of California

To the extent Plaintiff pleads that Dr. Ostroff's simultaneous scheduling of endoscopic procedures is "unsafe," his allegations cannot form the basis for a FCA claim because they lack any allegation of a regulatory violation.  Rather, there must be a false certification of compliance with underlying regulations.  This means that Plaintiff must, at the very least, plead that Dr. Ostroff violated the underlying regulations.

Plaintiff does not make any allegation that Dr. Ostroff violated § 415.172(a)(1)(i) by not being present for the "entire viewing" of an endoscopic procedure.  Rather, Plaintiff speculates that it would not have been possible for Dr. Ostroff to have been present given how many endoscopic procedures he scheduled simultaneously in different rooms.  Plaintiff provides as examples the schedules of two days in which Dr. Ostroff's scheduled up to five endoscopic procedures in a one-hour block.  *See id.* ¶¶ 122, 126.  However, Plaintiff also alleges that the minimum amount of viewing time for ERCPs and colonoscopies is fifteen minutes, and five minutes for EDGs.  *Id.* ¶ 116.  Thus, based on Plaintiff's allegations, it is possible that Dr. Ostroff was physically present for the "entire viewing" of each endoscopic procedure that was performed.  *Id.* § 415.172(a)(1)(i).  Plaintiff will have the opportunity to amend this portion of his pleadings.

iii.    <em>Unnecessary Endoscopic Procedures</em>

Like regulations governing the payment of physician-supervised resident services, this regulation is material to the government's decision to pay a claim because 42 U.S.C. § 1395y(a)(1)(A) expressly precludes payment for unreasonable or unnecessary procedures.  However, the Court nonetheless finds that Plaintiff's allegations relating to unnecessary procedures are insufficiently pled.

First, the Court rejects Plaintiff's contention that all of the alleged regulatory violations cited are part of the over-billing scheme which relates directly to Plaintiff's allegations of unnecessary medical procedures.  *See* Opp. at 2, 9-10.  The fact Dr. Ostroff allegedly used unqualified sedation nurses to perform anesthesia services and inadequately supervised the sedation nurses and residents is irrelevant to the question of whether the procedures were unnecessary.  The Second Circuit explained this distinction in *Mikes*:

> [T]he requirement that a service be reasonable and necessary generally pertains to the *selection* of the particular procedure and *not to its performance*.... While such factors as the effectiveness and medical acceptance of a given procedure might determine whether it is reasonable and necessary, the failure of the procedure to conform to a particular standard of care ordinarily will not.

*Mikes*, 274 F.3d at 701 (emphasis added).  Therefore, the Court's evaluation of unreasonable and unnecessary procedures is limited to Plaintiff's allegations in paragraphs 129-40 of the First Amended Complaint.

Those allegations are conclusory and fall far short of the heightened pleading standards required for a FCA claim.  Plaintiff merely describes the number and timing of certain endoscopic procedures performed on six different patients, and then makes the same conclusory allegation for each patient, stating that the "procedures detected nothing out of the ordinary and were apparently done as routine monitoring or check-ups and were completely unnecessary."  FAC ¶¶ 132-37.  Although Plaintiff alleges that several procedures were performed on the same patient in a relatively short period of time, Plaintiff does not attempt to describe *why* any one procedure was unnecessary.  Such allegations do not meet the heightened pleading standards for a FCA claim because they do not "provide any reliable indicia that [Dr. Ostroff was] performing medically unnecessary procedures for Medicare/Medicaid patients."  *United States ex rel. Frazier v. IASIS Healthcare Corp.*, 812 F.Supp.2d 1008, 1017 (D. Ariz. 2011); *see also Ebeid*, 616 F.3d at 999.  Plaintiff will have the opportunity to amend this portion of his pleadings.

### 4. Claim

Plaintiff has alleged that Dr. Ostroff and other physicians have caused UCSF Medical Center to submit claims to Medicare.  The Ninth Circuit has held that for this final element, "[a]ll that matters is whether the false statement or course of conduct causes the government to pay out money or to forfeit moneys due."  *Hendow*, 461 F.3d at 1177 (internal quotations omitted).  "[I]t is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork."  *Id.* (quoting *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005).  Therefore, Plaintiff's allegations on this final element are sufficient.

Defendants argue that Plaintiff's allegations fail to meet Rule 9(b)'s heightened pleading standards because Plaintiff does not allege (1) who submitted false claims to the government, (2) the date on which such claims were submitted, or (3) that Dr. Ostroff had actual knowledge that these alleged claims were submitted, and instead merely alleges that Dr. Ostroff and other physicians "presented or caused to be presented" claims to Medicare.  This argument ignores the Ninth Circuit's holding in *Ebeid* that a plaintiff need not "identify representative examples of false claims to support every allegation." *Ebeid*, 616 F.3d at 998.  Plaintiff has sufficiently plead this element by describing "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id*. at 998-99.

**B.     California Insurance Code § 1871.7(b)**

Plaintiff also asserts a claim under section 1871.7(b) of the California Insurance Code, which allows an interested person to bring an action, in the name of the State of California, for violations of California Penal Code § 550(b).  *See* Cal. Ins. Code § 1871.7(e)(1).  Section 550(b), in turn, states that it is unlawful to present a claim for payment to an insurance policy knowing that the statement contains false or misleading information concerning any material fact.  Cal. Penal Code § 550(b).  Unlike the federal False Claims Act, § 550(b) includes within its scope private insurance policies.  However, Defendant is correct to point out that the Medicare regulations cited by Plaintiff do not apply to private insurers.

Plaintiff does not challenge Defendant's contention that he cannot state a claim under § 550(b) for regulatory violations pertaining to sedation nurses or inadequately supervised residents. Plaintiff does, however, contend that he can bring a claim under section 1871.7(b) for "medically unnecessary" procedures.  As a preliminary matter, the Court notes that this allegation fails for the same reason as it does under the FCA–because Plaintiff has failed to allege unnecessary procedures with any particularity and only states conclusory assertions.  This claim fails on an additional ground, however, because Plaintiff has not identified any statute that requires claims submitted to private insurers to be medically necessary.  Section 550(b) prohibits several types of fraudulent conduct, but says nothing about medically unnecessary procedures.  *See* Cal. Penal Code § 550(b).

United States District Court
Northern District of California

Plaintiff mischaracterizes a case from the California Supreme Court, contending the court held that federal standards of medical necessity apply to claims brought under the California Insurance Code. Opp. at 11. However, the case cited by Plaintiff was not a false claim case. Rather, the court there merely decided a contractual dispute where the insurance "policy" only covered "medically necessary hospital services." *Sarchett v. Blue Shield of California*, 43 Cal.3d 1, 12 (1987). Plaintiff has not alleged that the claims to private insurance companies at issue here falsely asserted that the procedures involved were medically necessary, when they were not, and that the private policy at issue only covered such necessary procedures.

### C.      First Amendment Retaliation

Defendants argue that Plaintiff has failed to state a claim for First Amendment retaliation for three primary reasons. First, Defendants contend Plaintiff has failed to state a cognizable claim for retaliation under the First Amendment. Second, Defendants argue that even if they violated Plaintiff's First Amendment rights, such rights were not clearly established at the time of the alleged wrongdoing, and therefore, Defendants are entitled to qualified immunity. Finally, Defendants argue that Plaintiff has failed to show how each of the named Defendants were an "integral participant" in the adverse employment actions.[5]

### 1.      Whether Plaintiff States a Cognizable Retaliation Claim

This Court assesses the Plaintiff's claim for retaliation in violation of the First Amendment using the Ninth Circuit's five-step test:

> (1) whether the plaintiff spoke on a matter of public concern;
> (2) whether the plaintiff spoke as a private citizen or public employee;
> (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action;
> (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and
> (5) whether the state would have taken the adverse employment

---

[5] Defendants do not contest that they were acting under the color of state law. *See Chudacoff v. Univ. Med. Center of Southern Nevada*, 649 F.3d 1143, 1149 (9th Cir. 2011) ("To establish § 1983 liability, a plaintiff must show both (1) deprivation of a right secured by the Constitution and the law of the United States, and (2) that the deprivation was committed by a person acting under the color of state law.").

1       action even absent the protected speech.

2   *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).  While Plaintiff must sufficiently allege facts

3 to satisfy the first three factors, Defendants bear the burden of proving the latter two factors.  *See*

4 *id.* at 1071-72.

5                  i.         *Whether Plaintiff's Speech was a Matter of Public Concern*

6       "Speech involves a matter of public concern when it can fairly be considered to relate to

7 any matter of political, social, or other concern to the community."  *Eng*, 552 F.3d at 1070

8 (quoting *Johnson v. Multnomah Cnty., Or.*, 48 F.3d 420, 422 (9th Cir. 1995) (internal quotations

9 omitted)).  "In contrast, 'speech that deals with individual personnel disputes and grievances and

10 that would be of no relevance to the public's evaluation of the performance of government

11 agencies, is generally not of public concern.'"  *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d

12 917, 924 (9th Cir. 2004) (quoting *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003)).

13 "Whether a public employee or contractor's expressive conduct addresses a matter of public

14 concern is a question of law…. This determination is made in light of 'the content, form, and

15 context' of the expressive conduct 'as revealed by the whole record.'"  *Alpha Energy Savers*, 381

16 F.3d at 924 (quoting *Connick v. Myers,* 461 U.S. 138, 147-48 n. 7 (1983)).

17       Plaintiff alleges that he wrote a report on the investigation of the true cause of Patient

18 Doe's death−inadequate monitoring and likely oversedation−which differed from the reason

19 offered by the USCF Medical Center, which found that the cause of Patient Doe's death was

20 "inconclusive."  FAC ¶¶ 185-86, 189.  Then, when Plaintiff was subpoenaed to testify in the

21 wrongful death lawsuit brought by Patient Doe's family, Plaintiff told Defendants Adler and

22 Penney that he would testify that Patient Doe's death had been an accident caused by oversedation

23 and improper monitoring.  *Id.* ¶ 195.  After UCSF Medical Center settled that lawsuit, Plaintiff

24 continued to request that the UCSF Medical center reexamine the true cause of Patient Doe's

25 death and properly report her death to the State Medical Board.  FAC ¶¶ 209, 214.  Moreover,

26 Plaintiff's attorney wrote a letter to Defendants Adler and Laret informing them that Plaintiff had

27 contacted the California Attorney General and federal officials to report violations of state and

28 federal laws that engaged public health, as well as fraudulent billing.  *Id.* ¶ 216.  This speech does

United States District Court
Northern District of California

1    not deal "with individual personnel disputes and grievances that would be of no relevance to the

2    public's evaluation of the performance of government agencies." *Alpha Energy*, 381 F.3d at 924.

3    Rather, these instances of speech relate to a matter of public concern.

4            Defendants argue that Plaintiff's "expected testimony" is not actionable because Defendant

5    never in fact testified as to the cause of Jane Doe's death at the deposition.  This argument is

6    meritless.  Plaintiff informed Defendants of the content of Plaintiff's expected testimony.  That

7    testimony concerned the conduct of the hospital in connection with the death of a patient.  It was

8    certainly clearly established that "when government employees speak about corruption,

9    wrongdoing, misconduct, wastefulness, or inefficiency by other government employees, … their

10   speech is inherently a matter of public concern." *Alpha Energy*, 381 F.3d at 924.

11           Plaintiff's other instances of speech, including the letters from his lawyer and his own

12   discussions with Defendants regarding the death of Jane Doe, similarly challenged the UCSF

13   Medical Center's account of Patient Doe's death and regulatory violations.  Moreover, the letter

14   Plaintiff's attorney wrote to Defendants Adler and Laret regarding regulatory violations is

15   actionable as speech made by Plaintiff.  *Eng*, 552 F.3d at 1069 ("A client's free speech interest in

16   an attorney's speech on the client's behalf … necessarily follows from the client's First

17   Amendment right to retain counsel.").  Therefore, Plaintiff alleges sufficient facts to satisfy this

18   first element of his First Amendment retaliation claim.

19                          ii.      *Whether Plaintiff Spoke as a Private Citizen or Public Employee*

20           In *Garcetti v. Ceballos*, the Supreme Court held that "when public employees make

21   statements *pursuant to their official duties*, the employees are not speaking as citizens for First

22   Amendment purpose, and the Constitution does not insulate their communications from employer

23   discipline."  547 U.S. 410, 421 (2006) (emphasis added).  "Statements are made in the speaker's

24   capacity as citizen if the speaker 'had no official duty' to make the questioned statements, or if the

25   speech was not the product of 'performing the tasks the employee was paid to perform.'" *Eng*,

26   552 F.3d at 1071 (quoting *Posey v. Lake Pend Oreille School Dist. No. 84*, 546 F.3d 1121, 1126-

27   27 (9th Cir. 2008)).  "[T]he question of the scope and content of a plaintiff's job responsibilities is

28   a question of fact," thus, "[i]n evaluating whether a plaintiff spoke as a private citizen, we must …

1   assume the truth of the facts as alleged by the plaintiff with respect to employment

2   responsibilities." *Eng*, 552 F.3d at 1071 (internal quotations omitted).  However, "the ultimate

3   constitutional significance of the facts as found is a question of law." *Id.*

4          Defendants argue that Plaintiff's speech was not made as a private citizen, but rather in his

5   role as a public employee.  Specifically, Defendants contend that that Plaintiff's alleged speech

6   consists of reports and discussions made in his capacity as an investigator examining the cause of

7   Patient Doe's death, not as a private individual.  In the First Amended Complaint, Plaintiff

8   alleged:

9          *In his capacity* as Patient Doe's physician and the Vice Chair of the
           UCSF Department of Surgery Quality Improvement Program, Dr. Maa

10         also reviewed the documentation that had been done during and after
           Patient Doe's ERCP and wrote a Quality Improvement Report

11         regarding his findings.  In that report, Dr. Maa concluded that Patient
           Doe had likely died as a result of "Management − Sedation and

12         Monitoring," i.e. errors in the administration of anesthetic drugs.

13   FAC ¶ 185 (emphasis added).  Such allegations show that Plaintiff wrote the initial report regarding

14   the cause of Patient Doe's death as part of his job responsibilities.  Therefore, to the extent Plaintiff's

15   retaliation claim is based upon his initial report, it is dismissed.

16          Nevertheless, Plaintiff's expressive speech did not end with this initial report.  Plaintiff argues

17   that the following instances of his expressive speech, made subsequent to his initial report, were not

18   within his job duties: (1) Plaintiff's role as a witness and expected testimony concerning Patient

19   Doe's wrongful death; (2) Plaintiff's attorney's communications to the Medical Center, on

20   Plaintiff's behalf, which raised concerns about patient health and safety, violations of state and

21   federal regulations governing safety standards, and informed the Medical Center that Plaintiff was

22   reporting these concerns to the California Attorney General and the U.S. Attorney General; and (3)

23   Plaintiff's internal follow up disclosures about the cause of Patient Doe's death both before and

24   after the settlement.  Although the Court must "assume the truth of the facts as alleged by the

25   plaintiff with respect to employment responsibilities," *Eng*, 552 F.3d at 1071, Plaintiff has failed

26   to allege that the foregoing instances of speech were outside the scope of his job in his First

27   Amended Compliant.  Plaintiff will be given an opportunity to plead this element as to these

28   instances of protected speech in the amended complaint.

United States District Court
Northern District of California

34

iii.     *Whether Plaintiff's Speech was a Substantial or Motivating Factor in the Adverse Employment Action*

In the First Amendment context, "[t]he precise nature of the retaliation is not critical to the inquiry in First Amendment retaliation cases." *Coszalter v. City of Salem*, 320 F.3d 968, 974 (9th Cir. 2003). Rather, "[t]he goal is to prevent, or redress, actions by a government employer that 'chill the reasonable exercise of protected' First Amendment rights." *Id*. at 974-75 (quoting *Rutan v. Republican Party*, 497 U.S. 62, 73 (1990)).

Plaintiff's allegations sufficiently establish that he was subjected to adverse employment actions that would "chill the reasonable exercise of protected First Amendment rights." *Cozalter*, 320 F.3d at 974. Plaintiff alleges that during the meeting in which he informed Defendants Penney and Adler of his expected testimony, they began to be hostile and antagonistic, and Defendant Penney subsequently began making disparaging comments about Plaintiff to his peers and supervisors. FAC ¶¶ 195, 197. He alleges that a risk management report was put into his personal file which inaccurately summarized the events leading up to Patient Doe's death, and accused Plaintiff of disclosing protected information and weakening the defense in the wrongful death lawsuit. *Id*. ¶ 206. In 2010 and 2011, Plaintiff was given a one-year appointment as opposed to the standard two-year reappointment. *Id*. ¶¶ 210-11. In April of 2012, after Plaintiff applied for a promotion, he was informed that the only way for him to stay employed at UCSF was to accept a position as an adjunct that was not on the tenure-track. *Id*. ¶¶ 219-20. The adjunct position was a 46% reduction in Plaintiff's salary. *Id*.

Defendants argue that Plaintiff fails to demonstrate any link between his alleged speech and the adverse employment actions. Whether Plaintiff's protected speech was a substantial motivating factor the adverse employment actions is "purely a question of fact," and Plaintiff's allegations must be assumed to be true. *Eng*, 552 F.3d at 1071. Plaintiff states direct evidence of retaliation by alleging that Defendant Gropper informed him in January 2011 that the Credentials Committee had based their decision to recommend a one-year appointment—the beginning of the constructive denial of tenure—in part because of the issues raised in the Patient Doe case. FAC ¶ 211. In light of this allegation alone, Plaintiff has sufficiently pled that his speech was a

United States District Court
Northern District of California

1    motivating factor for the retaliation.

2           Moreover, Plaintiff alleges further circumstantial evidence of retaliation.  The Ninth

3    Circuit has held that a plaintiff may, in addition to alleging the defendant's awareness of the

4    protected speech, rely on three types of circumstantial evidence: (i) proximity in time between the

5    expressive conduct and the retaliatory actions; (ii) that the defendants expressed opposition to the

6    protected speech; or (iii) that Defendants' proffered explanations for their adverse actions were

7    false and pretextual.  *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 751-52 (9th Cir.

8    2001).  Plaintiff alleges that the named defendants were aware of Plaintiff's protected speech, and

9    several instances in which some of the named Defendants expressed their opposition to his speech.

10   For instance, Defendant Penney accused Plaintiff of playing "cloak and dagger" with evidence,

11   and told Defendant Ascher that Plaintiff was "the problem" with the defense of the wrongful death

12   lawsuit and that things would "get hostile" if Plaintiff chose his own lawyer.  FAC ¶¶ 197-98.

13   Moreover, an allegedly inaccurate risk management report was placed in Plaintiff's personal file

14   that blamed Plaintiff for disclosing confidential information and accused him of "unpredictability"

15   and the reason for settling the lawsuit.  *Id.* ¶ 206.

16                                    *       *       *

17          The final two factors in the *Eng* test are (1) whether Defendants had adequate justification

18   for treating Plaintiff differently from other members of the public, and (2) whether Defendants

19   would have taken the adverse employment action even absent the protected speech.  *Eng*, 552 F.3d

20   at 1070.  While Defendants bear the burden of proving either of these two factors to prevail on

21   Plaintiff's retaliation claim, Defendants argue in their Motion to Dismiss that Plaintiff's own

22   allegations show that these factors are satisfied.  These arguments are without merit.

23          First, Defendants argue that because Plaintiff alleges that Defendants relied on a the risk

24   management report which discussed Plaintiff's (1) disclosure of protected information, and (2)

25   making unsubstantiated allegations regarding a patient's case to unauthorized third parties,

26   Defendants were justified in disciplining Plaintiff because of their strong interest in

27   confidentiality.  This argument fails, however, because Plaintiff also alleges that the content of

28   that risk management report was not true, and because Plaintiff alleges that he did not actually

United States District Court
Northern District of California

1    disclose confidential information to unauthorized third parties.

2        Next, Defendants argue that Plaintiff's allegations establish that Defendants would have

3    taken the same course of action even if Plaintiff had not engaged in the alleged protected speech

4    because Plaintiff does not allege that the "*only* basis for the adverse employment actions were his

5    protected activity," but rather that his one-year reappointment "related *in part* to the Patient Doe

6    case." Motion at 24; FAC ¶ 211. However, the law does not require Plaintiff to allege that his

7    protected speech was the only basis for the adverse actions, but rather to allege facts which

8    plausibly show that the protected speech was a substantial or motivating factor for Defendants to

9    take the adverse actions. *Eng*, 552 F.3d at 1070; *Iqbal*, 556 U.S. at 663. In any event, Plaintiff

10   does allege that the basis for the adverse employment action was his protected speech. It is

11   Defendants' burden to prove that they would have taken the adverse employment action absent

12   Plaintiff's speech, and they have not met that burden through Plaintiff's allegations.

13       2.      Whether Defendants are Entitled to Qualified Immunity

14       Even if Plaintiff's allegations establish that his constitutional rights were violated,

15   Defendants are entitled to dismissal of his First Amendment retaliation claim if Defendants'

16   conduct did not "violate *clearly established* statutory or constitutional rights of which a reasonable

17   person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (emphasis added).

18   The "clearly established" requirement "operates to ensure that before they are subjected to suit,

19   [government officials] are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739

20   (2002) (internal quotations omitted). "If a plaintiff's constitutional rights were not clearly

21   established at the time of the violation, then qualified immunity should be granted." *Eng*, 522

22   F.3d at 1072.

23       Two bases upon which Defendants contend they are entitled to qualified immunity are

24   without merit. *See* Motion at 25; Reply at 15. First, Defendants contend that a reasonable official

25   would not know that is possible to retaliate against an employee for expected testimony when it is

26   no longer possible for that employee to testify. This argument misses the mark—the fact Plaintiff

27   did not testify is irrelevant if Defendants knew the content of Plaintiff's expected testimony from

28   prior communications and retaliated against him because of that expected testimony. Second,

United States District Court
Northern District of California

1    Defendants contend that a reasonable official would not expect that an employee's leaking of

2    confidential patient information to unauthorized third parties is protected speech.  However,

3    Plaintiff alleges that he never leaked confidential information and further alleges that the risk

4    management report was inaccurate.

5         Defendants also contend it was not clearly established that Plaintiff's internal follow-up

6    communications about the true cause of Patient Doe's death, as well Plaintiff's expected testimony

7    in the Patient Doe lawsuit, were made outside the scope of Plaintiff's job responsibilities.  This

8    argument rests on the incorrect assumption that Plaintiff's job duties are a question of law for the

9    Court to decide, rather than factual allegations which must be assumed to be true on Defendants'

10   Motion to Dismiss. *Eng*, 552 F.3d at 1071 ("While the question of the scope and context of a

11   plaintiff's job responsibilities is a question of fact, the ultimate constitutional significance of the

12   facts as found is a question of law.") (internal quotations omitted).  As noted above, Plaintiff has

13   not yet alleged whether his internal follow-up communications and expected testimony regarding

14   the cause of Patient Doe's death were part of his job responsibilities.  It is plausible that such

15   speech was not made pursuant to his "official duties."  *See id*. at 1073 (finding that "Eng's version

16   of the facts plausibly indicates he had no official duty" to engaged in the speech at issue).

17   Therefore, assuming Plaintiff amends his allegations to conform to his arguments in his brief, the

18   court "can determine whether … qualified immunity [is] appropriate only by assuming that the

19   version of material facts asserted by the non-moving party is correct."  *Id*. at 1073 (internal

20   quotations omitted).  Accordingly, the Court cannot grant Defendants qualified immunity at this

21   time.

22                    3.    Whether Plaintiff Sufficiently Pled Allegations against Each Individual
23                          Defendant

24        An individual's liability under § 1983 is predicated on that individual's "integral

25   participation" in the alleged deprivation of constitutional rights.  *See Boyd v. Benton Cnty.*, 374

26   F.3d 773, 780 (9th Cir. 2004).  That means liability cannot attach to "a mere bystander" who had

27   "no role in the unlawful conduct."  *Chuman v. Wright*, 76 F.3d 292, 294-94 (9th Cir. 1996)

28   (district court erred by instructing the jury that individual liability could be found by the

United States District Court
Northern District of California

38

1    deprivation of rights resulting from a "team effort"). However, "integral participation does not

2    require that each officer's actions themselves rise to the level of a constitutional violation." *Boyd*,

3    374 F.3d at 780 (citing cases from the Fifth Circuit where integral participation was found in an

4    officer who provided armed backup to an unconstitutional search, and an officer who stood armed

5    at the door while other officers conducted an unlawful search). Rather, for an individual to be

6    held liable under § 1983 for depriving someone of his or her constitutional rights, that individual

7    must have "participated in some meaningful way." *Id.* Non-voting membership on a committee

8    that votes to take an adverse action against a public employee is insufficient for "integral

9    participation." *Chudacoff*, 649 F.3d at 1151.

10       Defendants argue that Plaintiff has failed to allege how each individual defendant accused

11    of violating Plaintiff's First Amendment rights was an integral participant. The Court agrees.

12    Although Plaintiff pleads facts to suggest the level by which some Defendants were involved in

13    the alleged retaliation, for the majority of Defendants, Plaintiff asserts liability based on the

14    conclusory allegation that they were "involved" in one or more of the three main adverse

15    employment decisions. *See* FAC ¶¶ 210, 217, 220. This is insufficient. In an amended complaint,

16    Plaintiff must plead facts suggesting how each named Defendant "participated in some meaningful

17    way" in the deprivation of his First Amendment rights. *Boyd*, 374 F.3d at 780.

18    **V.**      **CONCLUSION**

19       For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED in part and

20    DENIED in part. Plaintiff's First Amended Complaint claim is DISMISSED with leave to amend.

21    Plaintiff will have thirty (30) days from the date of this order to file a Second Amendment

22    Complaint.

23       IT IS SO ORDERED.

24       Dated: April 19, 2013

25

26    Joseph C. Spero
      United States Magistrate Judge

27

28