1  KATHRYN BURKETT DICKSON, ESQ., State Bar No. 70636
   EMILY A. NUGENT, ESQ., State Bar No. 255048
2  DICKSON GEESMAN LLP
   1999 Harrison Street, Suite 2000
3  Oakland, CA 94612
   Tel.: (510) 899-4670
4  Fax: (510) 899-4671
   E-Mail: kathy@dicksongeesman.com
5  E-Mail: emily@dicksongeesman.com

6  Admitted *Pro Hac Vice*

7  DAVID K. COLAPINTO, ESQ., D.C. Bar #416390
   KOHN, KOHN & COLAPINTO, LLP
8  3233 P Street, N.W.
9  Washington, D.C. 20007-2756
   Phone: (202) 342-6980
10 Fax:     (202) 342-6984
   Email:  dc@kkc.com
11
   Attorneys for Plaintiff-Relator
12

13              **UNITED STATES DISTRICT COURT**

14        **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

15 UNITED STATES OF AMERICA, ex rel.,          )
   DR. JOHN MAA                                )   CASE NO.: 12-CV-0200-JCS
16 1200 Gough St, Apt 11E                       )
   San Francisco, CA 94109                     )
17                                             )   **SECOND AMENDED COMPLAINT**
   BRINGING THIS ACTION ON BEHALF              )
18 OF THE UNITED STATES OF AMERICA             )
                                               )
19 and                                         )   **JURY TRIAL DEMANDED**
                                               )
20 c/o HON. MELINDA HAAG                        )
   United States Attorney for the Northern     )
21 District of California                       )
   United States Attorney's Office             )
22 450 Golden Gate Ave,                         )
   San Francisco, CA 94102                     )
23                                             )
   and                                         )
24                                             )
   c/o ERIC H. HOLDER                           )
25 Attorney General of the United States       )
   U.S. Department of Justice                   )
26 10th and Constitution Avenues, N.W.         )
   Washington, DC 20530                        )
27

28                              1
   SECOND AMENDED COMPLAINT – Case No. 12-CV-0200-JCS

| | | |
|---|---|---|
| 1 | vs. | ) |
| 2 | | ) |
| | | ) |
| 3 | DR. JAMES W. OSTROFF | ) |
| | (in his personal capacity) | ) |
| | 505 Parnassus Ave. | ) |
| 4 | San Francisco, CA 94143 | ) |
| 5 | DR. JOSHUA ADLER | ) |
| | (in his personal capacity) | ) |
| 6 | 505 Parnassus Ave. | ) |
| | San Francisco, CA 94143 | ) |
| 7 | | ) |
| | DR. NANCY ASCHER | ) |
| 8 | (in her personal capacity) | ) |
| | 285 Edgewood Ave. | ) |
| 9 | San Francisco, CA 94117 | ) |
| | | ) |
| 10 | DR. SUSAN DESMOND-HELLMANN | ) |
| | (in her personal capacity) | ) |
| 11 | 505 Parnassus Ave. | ) |
| | San Francisco, CA 94143 | ) |
| 12 | | ) |
| | DR. ADRIENNE GREEN | ) |
| 13 | (in her personal capacity) | ) |
| | 505 Parnassus Ave. | ) |
| 14 | San Francisco, CA 94143 | ) |
| | | ) |
| 15 | DR. MICHAEL GROPPER | ) |
| | (in his personal capacity) | ) |
| 16 | 505 Parnassus Ave. | ) |
| | San Francisco, CA 94143 | ) |
| 17 | | ) |
| | DR. SAM HAWGOOD | ) |
| 18 | (in his personal capacity) | ) |
| | 505 Parnassus Ave. | ) |
| 19 | San Francisco, CA 94143 | ) |
| | | ) |
| 20 | MARK LARET | ) |
| | (in his personal capacity) | ) |
| 21 | 505 Parnassus Ave. | ) |
| | San Francisco, CA 94143 | ) |
| 22 | | ) |
| | DR. SALLY MARSHALL | ) |
| 23 | (in her personal capacity) | ) |
| | 505 Parnassus Ave. | ) |
| 24 | San Francisco, CA 94143 | ) |
| | | ) |
| 25 | SUSAN PENNEY | ) |
| | (in her personal capacity) | ) |
| 26 | 505 Parnassus Ave. | ) |
| | San Francisco, CA 94143 | ) |
| 27 | | |
| 28 | | |

2

SECOND AMENDED COMPLAINT – Case No. 12-CV-0200-JCS

1

2    DOES ONE through FIFTY,                        )
     (in their personal capacities)                 )
3                                                    )
                    Defendants.                      )
4                                                    )
     _____       )

5

6           PLAINTIFF-RELATOR, DR. JOHN MAA, brings this qui tam action in the name of the

7    United States of America and himself to recover damages and civil penalties from Defendant Dr.

8    James Ostroff, in his personal capacity, and others not named in this Complaint, who committed,

9    or caused others to commit, violations of the Federal False Claims Act, 31 U.S.C. § 3729, *et seq*,.

10   Plaintiff-Relator Maa also brings this action to recover damages resulting from all of the other

11   named individual Defendants, in their personal capacities and who acted under color of state law,

12   for violations of 42 U.S.C. § 1983, for unlawful retaliation due to Dr. Maa's protected speech in

13   violation of the First Amendment to the United States Constitution.  Plaintiff-Relator also seeks

14   injunctive and declaratory relief against the individual defendants in their official and personal

15   capacities for violations of 42 U.S.C. § 1983.

16                                      **INTRODUCTION**

17   1.    Defendant Dr. James Ostroff and other physicians not named in herein have fraudulently

18         billed, or caused to be billed, Medicare, Medi-Cal, Tricare, and other health insurance

19         programs funded or administered by the United States, for numerous Endoscopic

20         Retrograde Cholangiopancreatography ("ERCP"), Esophagogastroduodenoscopy

21         ("EGD"), colonoscopy, and other similar endoscopic procedures performed by Dr.

22         Ostroff and others.  Defendant Ostroff routinely failed to use an appropriate

23         anesthesiologist or nurse anesthetist during these procedures as required by federal law

24         and regulations.  In order to obtain payment from the federal government, Dr. Ostroff

25         falsely certified, and/or caused others to falsely certify, that all procedures were

26         performed in compliance with all Medicare and other applicable regulations and laws.

27

28
                                              3
     _____
     SECOND AMENDED COMPLAINT – Case No. 12-CV-0200-JCS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2.      By engaging in this conduct, Defendant Ostroff and other doctors have committed, and caused others to commit, intentional violations of the False Claims Act, 31 U.S.C. § 3729, *et seq.*  These violations include, but are not limited to: (1) presenting and/or causing to be presented false claims to Medicare, Medi-Cal, Tricare and other government insurance, for ERCPs, EGDs, colonoscopies, and other procedures allegedly performed by Dr. Ostroff and other doctors that did not comply with Medicare laws or regulations; (2) making and/or causing to be made false statements and/or records material to such false claims; and (3) making and/or using false records material to an obligation to pay money to the United States and concealing said obligation.

3.      Plaintiff-Relator Maa has engaged in speech on matters of public concern related to patient safety and fraudulent billing practices.  In response to Dr. Maa's protected speech, Defendants Adler, Ascher, Desmond-Hellmann, Green, Gropper, Hawgood, Laret, Marshall and Penney have deliberately and wantonly engaged in retaliation against Dr. Maa, including but not limited to: (1) failing to grant Plaintiff-Relator a full two year reappointment of clinical privileges; (2) failing to promote Plaintiff-Relator to Associate Professor; (3) downgrading Plaintiff-Relator's position and responsibilities; (4) reducing Plaintiff-Relator's salary; (5) constructively discharging Plaintiff-Relator; (6) injuring Plaintiff-Relator's reputation and impeding his career advancement; and (7) causing Plaintiff-Relator significant emotional distress and other non-pecuniary harm.

## JURISDICTION AND VENUE

4.      This action arises under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, and 42 U.S.C. § 1983.

5.      Subject matter jurisdiction over all federal causes of action is conferred upon this Court by 28 U.S.C. § 1331, in that this action arises under the laws of the United States, by and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions

brought pursuant to 31 U.S.C. §§ 3729 and 3730, and by 42 U.S.C. § 1983, which specifically confers jurisdiction on this Court for actions brought pursuant to that statute.

6.  Venue is proper in this Court pursuant to 28 U.S.C § 1391(c) and 31 U.S.C. § 3732(a) as the Court has personal jurisdiction over at least one defendant who can be found in, resides, transacts business, or has performed acts proscribed by 31 U.S.C. § 3729 in this district.  At least one defendant also caused false claims to be made or certified in this jurisdiction.

7.  Pursuant to the requirements of 31 U.S.C § 3730(b) Plaintiff-Relator provided the federal government with a confidential written disclosure statement of material and information regarding the alleged violations.

8.  There has been no public disclosure of the allegations contained herein.  To the extent jurisdictionally required, Plaintiff-Relator is an original source within the meaning of 31 U.S.C. § 3730(e)(4).

9.  Plaintiff-Relator has complied with all conditions precedent to bringing this action.

## PARTIES

10.  Plaintiff-Relator Dr. John Maa ("Plaintiff-Relator" or "Dr. Maa") is a United States citizen and during times relevant to this action worked as a general surgeon at UCSF Medical Center and an assistant professor in general surgery at UCSF School of Medicine and is certified by the American Board of Surgery.  Dr. Maa specializes in emergency surgical care as well as surgery for abdominal wall reconstruction, enterocutaneous fistula repair and hernia.  In addition to his clinical practice, Dr. Maa has served as the Assistant Chair of the UCSF Department of Surgery Quality Improvement Program and participated on several other advisory boards and committees on improving care in hospitals nationwide.  He is also a member of the board of directors of the American Heart Association in San Francisco, assistant clerkship director in surgery for the UCSF School of Medicine.  During a general surgical residency at UCSF, Dr. Maa

was awarded a National Institutes of Health gastrointestinal research training grant, and published numerous scientific articles on pancreatic and gastrointestinal inflammation. He later completed a health care policy fellowship at the UCSF Institute of Health Policy Studies, where he researched ways to improve general surgical care nationally.  This resulted in the implementation of the UCSF Surgical Hospitalist program at UCSF Medical Center in 2005 to improve the timeliness and quality of emergency surgical care, for which he was recognized nationally as one of "20 People Who Make Healthcare Better" by HealthLeaders Magazine in 2009.  Dr. Maa earned a medical degree at Harvard Medical School and served as a captain in the medical corps of the U.S. Army for nine years.  Dr. Maa resides at 1200 Gough St, Apt 11E, San Francisco, CA 94109.

11.     Plaintiff-Relator brings this action on behalf of the United States of America and himself.

12.     Defendant Dr. James W. Ostroff is a United States citizen who works as a gastroenterologist and directs the Endoscopy unit and Gastrointestinal Consultation Service at UCSF Medical Center.  He has established one of the largest endoscopic retrograde cholangiopancreatography ("ERCP") training programs in North America. Dr. Ostroff's office is located at 505 Parnassus Ave., San Francisco, CA 94143.  Dr. Ostroff is named in this suit in his personal capacity and Dr. Ostroff benefitted personally from these alleged violations.

13.     Defendant Dr. Joshua Adler is a United States citizen and the Chief Medical Officer of UCSF Medical Center.  Dr. Adler's office is located at 505 Parnassus Ave., San Francisco, CA 94143.  Dr. Adler is named in this suit in his personal and official capacities.

14.     Defendant Dr. Nancy Ascher is a United States citizen and the Chair of the Department of Surgery at UCSF Medical Center.  Dr. Ascher's office is located at 505 Parnassus Ave., San Francisco, CA 94143.  Dr. Ascher is named in this suit in her personal and official capacities.

15.   Defendant Dr. Susan Desmond-Hellmann is a United States citizen and the Chancellor of UCSF. Dr. Desmond-Hellmann's office is located at 505 Parnassus Ave., San Francisco, CA 94143. Dr. Desmond-Hellmann is named in this suit in her personal and official capacities.

16.   Defendant Dr. Adrienne Green is a United States citizen and the Associate Chief Medical Officer of UCSF Medical Center. Dr. Green's office is located at 505 Parnassus Ave., San Francisco, CA 94143. Dr. Green is named in this suit in her personal and official capacities.

17.   Defendant Dr. Michael Gropper is a United States citizen and the President of the Medical Staff at UCSF Medical Center. Dr. Gropper was previously Chairman of the Credentials Committee. Dr. Gropper's office is located at 505 Parnassus Ave., San Francisco, CA 94143. Dr. Gropper is named in this suit in his personal and official capacities.

18.   Defendant Dr. Sam Hawgood is a United States citizen and the Dean of the School of Medicine at UCSF. Dr. Hawgood's office is located at 505 Parnassus Ave., San Francisco, CA 94143. Dr. Hawgood is named in this suit in his personal and official capacities.

19.   Defendant Mr. Mark Laret is a United States citizen and the Chief Executive Officer of the UCSF Medical Center. Mr. Laret's office is located at 505 Parnassus Ave., San Francisco, CA 94143. Mr. Laret is named in this suit in his personal and official capacities.

20.   Defendant Dr. Sally Marshall is a United States citizen and the Vice Provost of the School of Medicine at UCSF. Dr. Marshall's office is located at 505 Parnassus Ave., San Francisco, CA 94143. Dr. Marshall is named in this suit in her personal and official capacities.

SECOND AMENDED COMPLAINT – Case No. 12-CV-0200-JCS

21.   Defendant Susan Penney is a United States citizen, the Director of Risk Management at UCSF Medical Center.  Ms. Penney's office is located at 505 Parnassus Ave., San Francisco, CA 94143.  Ms. Penney is named in this suit in her personal and official capacities.

22.   Defendants Does, 1 through 50, are sued in their personal capacities for violations of all Counts.

23.   Each of the individual Defendants is sued in their personal capacities, acted under color of state law and for abuse of their respective authority or position in committing the alleged violations.

## MEDICARE

24.   Medicare is a federal program that provides medical insurance for covered services to any person 65 years or older and to certain disabled persons.  42 U.S.C. §§ 426, 426A, 1395-1395ggg.  Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a component of Department of Health and Human Services ("HHS").

25.   The United States provides reimbursement through CMS for claims submitted under Medicare Parts A and B. CMS provides this reimbursement by forming contracts with private insurance carriers to administer, process, and pay Medicare claims.  In this capacity, the private insurance carrier acts on behalf of CMS and receives, pays, or rejects submitted claims based upon Medicare rules, regulations, and procedures.

### A.   Medicare Part A

26.   Part A of the Medicare program authorizes payment for institutional care, including but not limited to hospital admissions and services received during hospitalization.  42 U.S.C. §§ 1395c-1395i-4.

27.   To bill Medicare and receive reimbursement for claims for inpatient services, a hospital must file a provider agreement with the Secretary of HHS.  42 U.S.C. § 1395cc. The

provider agreement conditions reimbursement for claims on compliance with the requirements of applicable statutes and regulations. *Id.*

28. In addition to other limitations on coverage, Medicare covers only those services that are actually rendered and are "reasonable and medically necessary." 42 U.S.C. § 1395y(a)(1)(A).

29. Under Medicare Part A, the amount that Medicare pays to a hospital for inpatient services is based primarily on the particular diagnosed illness or condition that led to the patient's admission to the hospital, or the patient's illness or condition that is principally treated by the hospital. Medicare also looks at whether the patient had other problems that were treated at the hospital; these other problems are called "complications or co-morbidities" and are represented by a secondary diagnosis.

**B.     Medicare Part B**

30. Part B of the Medicare program authorizes payment for outpatient and general medical care in return for payments of monthly premiums in amounts established by HHS.

31. The benefits covered by Medicare Part B include medical treatment and services performed by physicians.

32. An enrolled beneficiary who obtains a covered medical service can either pay for the medical service himself, and request reimbursement of 80% of the reasonable charge, or assign the right to reimbursement to the physician providing the service, who collects payment as an assignee of the beneficiary under 42 U.S.C. § 1395(b)(3)(B)(ii). The funds to reimburse claims originate from the Medicare Trust Fund.

**MEDICAID/MEDI-CAL**

33. Medicaid is the nation's medical assistance program for the needy, the medically-needy aged, blind, and disabled and families with dependent children. 42 U.S.C. §§ 1396-1396v.

34. In California, the Medicaid program is called Medi-Cal. Among other forms of medical assistance, the Medi-Cal program covers inpatient and outpatient diagnostic procedures like ERCPs, EGDs, and colonoscopies.

35. Unlike Medicare, Medicaid is administered primarily by the states and funded by a combination of Federal and State funds, and is also regulated by a combination of federal and state laws. In California, and at all times relevant to this Complaint, the federal government paid 50% of all Medi-Cal claims. 42 U.S.C. § 1396d(b).

36. The Medicaid statute requires each participating state to implement a plan containing certain specified minimum criteria for coverage and payment of claims. 42 U.S.C. §§ 1396, 1396a(a)(13), (30)(A).

37. Like Medicare Part B, Medi-Cal pays providers for services actually rendered, as represented on the claim form, and services that are reasonable and medically necessary.

38. Providers who do not perform medically necessary services and the services identified on the claims form are not entitled to reimbursement from Medicare and Medicaid for those services.

39. By becoming a participating provider in the Medi-Cal program, UCSF Medical Center agreed to abide by all laws, regulations, and procedures applicable to that program, including those governing reimbursement.

## TRICARE

40. TRICARE is a government funded insurance program managed by the TRICARE Management Activity (TMA), a field activity of the Undersecretary of Defense for Personnel and Readiness. The TMA manages the TRICARE budget, executes TRICARE policies and oversees the entire TRICARE health program.

41. TRICARE administers health benefits for active duty military personnel, reserve military personnel, retired military and military dependents. In California, TriWest Healthcare Alliance provides health benefits to military families in the TRICARE West Region.

42. Like Medicare, TRICARE pays providers for services actually rendered, as represented on the claim form, and services that are reasonable and medically necessary.

43. By becoming a participating provider in TRICARE, UCSF Medical Center agreed to abide by all laws, regulations, and procedures applicable to that program, including those governing reimbursement.

## REIMBURSEMENT FOR MEDICAL SERVICES

44. In order to obtain reimbursement from Medicare, Medi-Cal and/or TRICARE for inpatient and outpatient diagnostic procedures like ERCPs, EGDs, and colonoscopies, a provider must comply with a strict statutory and regulatory scheme administered by the California Department of Health Services (for Medi-Cal) and the Centers for Medicare and Medicaid Services ("CMS"), a component of Department of Health and Human Services ("HHS") (for Medicare).  In order to receive reimbursement from the government, providers must comply with numerous "Conditions of Participation" that define the procedures and standards of care that must be followed in the course of treatment.

45. Compliance with the Conditions of Participation is material to the decision by both the federal and state government to pay Medicare or Medi-Cal claims, and providers implicitly certify that they have complied with these Conditions of Participation each time they present a claim for goods or services.

46. Participation in Medi-Cal requires meeting all requirements for participation in Medicare. 42 C.F.R. § 482.1(a)(5).

47. As a condition of participation in Medicare and Medi-Cal, and thus as a condition for receiving reimbursement for medical services, a hospital "must be in compliance with applicable Federal laws related to the health and safety of patients."  42 C.F.R. § 482.11(a).  The hospital must also "assure that personnel are licensed or meet other applicable standards that are required by State or local laws."  42 C.F.R. § 482.11(c).

48. As a condition of participation in Medicare and Medi-Cal, and thus as a condition for receiving reimbursement for medical services, a hospital "must have an effective governing body legally responsible for the conduct of the hospital as an institution." 42 C.F.R. § 482.12. This governing body "must ensure that the medical staff is accountable to the governing body for the quality of care provided to patients." 42 C.F.R. § 482.12(a)(5).

49. As a condition of participation in Medicare and Medi-Cal, and thus as a condition for receiving reimbursement for medical services, anesthesia "must be administered only by – (1) a qualified anesthesiologist; (2) a doctor of medicine or osteopathy (other than an anesthesiologist); . . . (4) A certified registered nurse anesthetist (CRNA) . . . [who] is under the supervision of the operating practitioner or of an anesthesiologist who is immediately available if needed; or (5) An anesthesiologist's assistant . . . who is under the supervision of an anesthesiologist who is immediately available if needed." 42 C.F.R. §§ 482.52(a), 485.639(c)(2).

50. The California Medicaid program, known as Medi-Cal, also has its own requirements for billing for services that are in some respects stricter than Medicare's requirements. Medi-Cal requires that, in order to bill for anesthesia services, "[t]he supervising anesthesiologist is permitted to supervise a maximum of two operating rooms and must remain within visual and auditory range … Medical direction excludes the simultaneous administration of anesthesia services while supervising."

51. Medicare also has other regulations governing the conditions of payment that prohibit the reimbursement of claims where "qualified" individuals do not administer deep sedation, or where other requirements related to anesthesia services are not met. 42 C.F.R. § 414.46(a)(2) and (d)(1); 42 C.F.R. § 415.110(a)(1).

52. Additionally, other Medicare regulations prohibit the payment for endoscopic procedures that are not performed or supervised by a teaching physician as required by the

regulations.  42 C.F.R. § 415.172.  In cases where, as here, the teaching physician is directing or assuming responsibility for deep sedation the teaching physician must be present for the entire procedure, not just the entire viewing.  42 C.F.R. § 415.172(a); 42 C.F.R. § 414.46(a)(2) and (d)(1); 42 C.F.R. § 415.110(a)(1).

53.  As a condition of participation in Medicare and Medi-Cal and TRICARE, and thus as a condition for receiving reimbursement for medical services, the "provider, supplier, or beneficiary, as appropriate, must furnish to the intermediary or carrier sufficient information to determine whether payment is due and the amount of payment."  42 C.F.R. § 424.5(a)(6).

54.  In order to obtain reimbursement from Medicare/Medi-Cal and TRICARE for an ERCP, a hospital must certify compliance with all applicable regulations. By failing to comply with these regulations, Dr. Ostroff and others made material false statements claims and/or caused the Medical Center to make material false statements and present false claims.

55.  By their conduct, Dr. Ostroff and others knowingly submitted false claims, and/or caused the Medical Center to make false statements and present false claims, for numerous inpatient and outpatient diagnostic procedures, including but not limited to, ERCPs, EGDs, colonoscopies, and other endoscopic and related services from at least 2005 through the present (and continuing).

## FRAUDULENT ACTIVITIES

### A.    Medical Procedures

56.  An ERCP is a procedure that combines the use of x-rays and an endoscope (a long, flexible, lighted tube and camera), which permits the physician to examine the ducts that drain the patient's liver, gallbladder, and pancreas.

57. During an ERCP, the physician inserts the endoscope into the patient's mouth and guides it down his or her throat into the esophagus, stomach, and duodenum (the first part of the small intestine) until it reaches the point where the ducts from the pancreas (pancreatic ducts) and gallbladder (bile ducts) drain into the duodenum.  Through the endoscope, the physician can directly observe the stomach and duodenum.  The physician can also use the endoscope to inject special dyes that are visible to x-rays (through a process called fluoroscopy) into the patient's bile and pancreatic ducts, which allows indirect examination of the pancreas, liver, and gallbladder via an x-ray machine.

58. An ERCP typically requires a minimum of twenty to thirty minutes to perform, but may last two hours or longer..

59. An EGD is similar and less invasive than an ERCP, as it does not utilize fluoroscopy and is thus limited to examinations of the esophagus, stomach, and duodenum.

60. An EGD may be performed in as little as five to ten minutes, but may last up to thirty minutes or longer.

61. A colonoscopy is a procedure that uses an endoscope to examine a patient's rectum and large intestine.

62. A colonoscopy is performed by inserting the endoscope into the patient's anus and maneuvering it through the colon.

63. A colonoscopy requires a minimum of twenty to thirty minutes to perform, and may last an hour or longer.

64. Dr. Ostroff's patients who undergo endoscopic procedures, including ERCP, EGD, and colonoscopy, are routinely placed into a state of  "deep" sedation so as to avoid discomfort and otherwise prevent injury to the patient such as organ perforation.

///

///

///

SECOND AMENDED COMPLAINT – Case No. 12-CV-0200-JCS

**B.** **Use of Sedation Nurses to Administer Deep Sedation in Violation of  Medicare Regulations.**

65.  For the purposes of seeking reimbursement from the government under Medicare and TRICARE, a procedure requiring a patient to undergo deep sedation qualifies as an anesthetic service which can only be administered by qualified providers listed in 42 C.F.R. § 482.52(a); 42 C.F.R. § 482.52(a)(3); 42 C.F.R. § 414.46(a)(2), (c), or (d)(1); 42 C.F.R. § 415.110(a) and (b).

66.  According to 42 C.F.R. § 482.52(a), deep sedation "must be administered only by: (1) a qualified anesthesiologist; (2) a doctor of medicine or osteopathy (other than an anesthesiologist); (3) A dentist, oral surgeon, or podiatrist who is qualified to administer anesthesia under State law; (4) A certified registered nurse anesthetist (CRNA) . . . [who] is under the supervision of the operating practitioner or of an anesthesiologist who is immediately available if needed; or (5) An anesthesiologist's assistant . . . who is under the supervision of an anesthesiologist who is immediately available if needed."

67.  Plaintiff-Relator became aware that anesthesia services in the form of deep sedation were routinely administered by unqualified "sedation nurses" without an  anesthesiologist being present or immediately available.

68.  Dr. Ostroff's standard practice was to allow a "sedation nurse" (a registered nurse with on-the-job training in the use of sedation drugs) to administer deep sedation and perform the monitored anesthesia care to his patients.

69.  None of the sedation nurses utilized by Dr. Ostroff to perform deep sedation on patients were qualified to do so under 42 C.F.R. § 482.52(a); 42 C.F.R. § 482.52(a)(3); 42 C.F.R. § 414.46(a)(2), (c), or (d)(1); 42 C.F.R. § 415.110(a) and (b).

70.  Upon information and belief, Dr. Ostroff participated in formulating the schemes to bill for services without proper supervision.  Dr. Ostroff served on the committee that approved the hospital's policies to permit "sedation nurses" to administer deep sedation

in violation of 42 C.F.R. § 414.46(a)(2) and (d)(1); 42 C.F.R. § 415.110(a)(1), and 42 C.F.R. § 482.52(a).

71.   Before each endoscopic procedures was performed Dr. Ostroff prepared a UCSF Medical Center form known as the "Radiology Procedure and sedation titration order form" ("Sedation Form").  The Sedation Form included a check-off box to indicate whether the patient was to be subjected to "moderate sedation" or "deep sedation."  For each such procedure, Dr. Ostroff signed the Sedation Form and also specified the dose and method of delivery of the sedation drugs to be used during the course of the procedure.  This Sedation Form signed by Dr. Ostroff became a part of the medical record in the patient's case and would be relied upon by the UCSF Medical Center to create bills to be sent to Medicare, Medicaid and other government payors.

72.   At the express direction of Dr. Ostroff, his patients were placed into deep sedation of his by a "sedation nurse."  Dr. Ostroff intentionally used a sedation nurse when placing his patients under deep sedation and, as such, made no arrangement for an anesthesiologist or other qualified provider to be present.

73.   Dr. Ostroff was alone responsible for supervising the sedation of his patients by a sedation nurse and he knew that an anesthesiologist was not immediately available when his patients underwent deep sedation.

74.   The sedation nurses Dr. Ostroff used to administer deep sedation and perform monitored anesthesia care to his patients include Donna Hayes, Foster Steele, Charlene Fong, David Prince, Karen Breen, and Marietta Escalona.  None of these "sedation nurses" were qualified under Medicare regulations to perform deep sedation.

75.   Dr. Ostroff hired or otherwise had knowledge of the credentials of the sedation nurses he utilized to administer deep sedation to his patients and therefore knew that the sedation nurses he utilized, including Hayes and Steele, did not have the qualifications to perform deep sedation as required by the Medicare regulations.

SECOND AMENDED COMPLAINT – Case No. 12-CV-0200-JCS

76.   At the time Dr. Ostroff completed the Sedation Form and checked-off the "deep sedation" box he knew that the anesthetic procedure would, unless he specified that an anesthesiologist or other qualified person perform the procedure, be administered by a "sedation nurse" who did not meet the qualifications required under 42 C.F.R. § 482.52; 42 C.F.R. § 482.52(a)(3); 42 C.F.R. § 414.46(a)(2), (c), or (d)(1); 42 C.F.R. § 415.110(a) and (b).

77.   During the relevant time period, Dr. Ostroff knew reimbursement from the government would be sought for endoscopic procedures he conducted when his patients were kept in deep sedation by a "sedation nurse" who did not meet the qualifications required under 42 C.F.R. § 482.52; 42 C.F.R. § 482.52(a)(3); 42 C.F.R. § 414.46(a)(2), (c), or (d)(1); 42 C.F.R. § 415.110(a) and (b).

78.   Dr. Ostroff knew and otherwise caused information to be recorded into patient's medical record he knew would be used by the UCSF Medical Center billing department to seek reimbursement from the federal government for procedures he performed where the patient was placed under deep sedation by unqualified sedation nurses.

79.   Dr. Ostroff regularly received periodic reports of the actual billings and derived compensation from these improper billings.

80.   Dr. Ostroff and other similarly situated physicians are paid an annual bonus based on the amount of revenue that generated for the hospital, i.e. the number of ERCPs and other procedures that are performed each year.  Upon information and belief, the use of sedation nurses allowed Dr. Ostroff to maximize the number of procedures he could conduct on a given day thereby increasing his monetary reward or bonus.

81.   Dr. Ostroff knew the claims submitted to Medicare/MediCal in which deep sedation was administered to his patients by unqualified sedation nurses would result in the payment of claims that Medicare/Medicare deemed improper.

82.   Dr. Ostroff knowingly did not take any action to correct the submission of improper billings to Medicare/Medicaid that he knew were submitted for payment and in violation of 42 C.F.R. § 482.52; 42 C.F.R. § 482.52(a)(3); 42 C.F.R. § 414.46(a)(2), (c), or (d)(1); 42 C.F.R. § 415.110(a) and (b).

83.   Dr. Ostroff knowingly allowed sedation nurses under his supervision to administer deep sedation and perform monitored anesthesia care to his patients is a violation of the Medicare and Medi-Cal regulations.  Dr. Ostroff's actions directly caused false claims to be presented to Medicare, Medi-Cal, or any other government insurance program for procedures involving monitored anesthesia care performed by an unsupervised sedation nurse.

84.   Dr. Ostroff and the other gastroenterologists who perform endoscopic procedures on deeply sedated patients at the UCSF Medical Center collectively perform thousands of procedures on patients covered by Medicare, Medi-Cal, and other government insurance. In each and every case where an unqualified sedation nurse was used to deeply sedate a patient, Dr. Ostroff was directly responsible for including in the patient records information that would be presented to the UCSF Medical Center billing department.  Dr. Ostroff and others knew that the information they provided or caused to be provided to the UCSF billing department would generate requests for reimbursement from Medicare, Medicaid or other government payors.  As a result, Dr. Ostroff and others presented, or caused others to present, false claims and made, or caused others to make, material false statements to Medicare, Medi-Cal and other government insurance programs for procedures involving deep sedation administered by unsupervised and unqualified sedation nurses.

85.   As a result of this conduct, Dr. Ostroff and others presented, or caused others to present, false claims and made, or caused others to make, material false statements to Medicare, Medi-Cal and other government insurance programs for numerous medical or diagnostic

procedures involving deep sedation administered by unsupervised and unqualified sedation nurses in the Radiology department and other departments, on an ongoing and continuing basis.

### D.     Billing for Endoscopic Procedures Not Performed or Supervised by a Physician

86. Pursuant to 42 C.F.R. § 415.172(a): "If a resident participates in a service furnished in a teaching setting, physician fee schedule payment is made only if a teaching physician is present during the key portion of any service or procedure for which payment is sought."

87. In the case of "surgical, high-risk, or other complex procedures, the teaching physician must be present during all critical portions of the procedure and immediately available to furnish services during the entire service or procedure." 42 C.F.R. § 415.172 (a)(1).

88. For purposes of qualifying for Medicare/Medi-Cal reimbursement, "Resident means an intern, resident, or fellow who participates in an approved medical residency program, including programs in osteopathy, dentistry, and podiatry, as required in order to become certified by the appropriate specialty board." 42 USC § 413.75(b).

89. Because Dr. Ostroff opted to direct the anesthesia services in deep sedation cases he was required to be present for the entire endoscopic procedure, from the initial sedation of the patient until the post-anesthesia evaluation and transfer of the patient to recovery from the deep sedation. 42 C.F.R. § 482.52(a)(3). Dr. Ostroff was taking responsibility for administering or directing the deep sedation under 42 C.F.R. § 482.52(a)(3); 42 C.F.R. § 414.46(a)(2), (c), or (d)(1); 42 C.F.R. § 415.110(a) and (b).  Therefore, Dr. Ostroff was not permitted to leave after the entire endoscopic "viewing" as permitted in 42 C.F.R. § 415.172(a)(1)(ii) in deep sedation cases because he was required to fulfill his obligations to ensure the deep sedation was performed by qualified persons.

90.   In cases where the teaching physician is also not taking responsibility for administering or directing the deep sedation, in order for the UCSF Medical Center to bill Medicare/Medi-Cal or TRICARE for an ERCP, EGD, colonoscopy, or any other endoscopic procedure performed by a resident under the supervision of a gastroenterologist like Dr. Ostroff, that teaching physician would only have to be physically present for the entire viewing, which is the time that the endoscope was within the patient's body.  While this time might be as short as five minutes for an EGD, ERCPs and colonoscopies typically require a minimum of 15-30 minutes, and could take up to an hour to perform.    However, when the extra duties of performing or directing deep sedation is factored in, the amount of time that Dr. Ostroff was required to be present was considerably longer than the "entire viewing," because he was required to be present for the "entire procedure," including those additional portions of the procedure that related to deep sedation, and post-anesthesia evaluation.

91.   Dr. Ostroff regularly fails to adequately supervise residents during endoscopic procedures.

92.   Dr. Ostroff regularly performs as many as five simultaneous ERCPs and other endoscopic procedures in different rooms.

93.   These different rooms are located on three different floors:  (1) the endoscopy suite for colonoscopies is on the first floor, near the Emergency Department; (2) the ERCP suite with fluoroscopy is on the third floor, near Radiology; and (3) the operating room is on the fourth floor.

94.   It is not physically possible to be present for three or more procedures taking place simultaneously in different rooms on three different floors during the same hour and still comply with the requirements of 42 C.F.R. §415.172(a); 42 C.F.R. § 482.52(a)(3); 42 C.F.R. § 414.46(a)(2), (c), or (d)(1); 42 C.F.R. § 415.110(a) and (b).  By billing Medicare, Medi-Cal and other government payors for these procedures, Dr. Ostroff and

others knowingly and deliberately submitted, or caused to be submitted, claims for work that Dr. Ostroff either did not perform, or that he performed so quickly as to be in violation of Medicare regulations requiring that he be present for the entire procedure.

95. Dr. Ostroff typically books a room for an EGD, ERCP, or colonoscopy for an entire hour, which is consistent with the usual time that these procedures should require.

96. However, while Dr. Ostroff might perform procedures in less than an hour, Dr. Ostroff regularly schedules up to *five* simultaneous endoscopic procedures in five different rooms on three different floors.  Even assuming that each procedure took only the minimum possible time to perform, something that obviously cannot be predicted in advance, it would still be impossible for Dr. Ostroff to personally perform or be present for each of these procedures in their entirety.

97. For example, on May 3, 2002, Dr. Ostroff scheduled two colonoscopies, an EGD, and an ERCP in four different rooms located on different floors in the 8:00am-9:00am block. He then scheduled two more colonoscopies and another EGD in different rooms on different floors from 9:00am-10:00am, another ERCP from 9:30am-10:30am, three more EGDs and a colonoscopy on different floors from 10:00am-11:00am, another ERCP from 10:30am-11:30am, three more colonoscopies and an EGD on different floors from 11:00am-12:00pm, another ERCP in a suite on a different floor from 11:30am-12:30pm, an EGD and a colonoscopy on a different floor from 12:00pm-1:00pm, and three more ERCPs on a different floor at 12:30pm, 1:30pm, and 2:30pm.

98. Ten colonoscopies, seven EGDs, and seven ERCPs, should have taken Dr. Ostroff an average of more than ten hours to perform, plus additional time to meet with the patients, supervise the initial administration of sedation drugs, meet his responsibilities to direct or administer anesthesia in the deep sedation cases, move between three different floors to perform procedures in different rooms scheduled within the same hour, and wash his hands.

99.   Because the anesthesia during these procedures is administered by a sedation nurse, Dr. Ostroff must personally perform a "pre-anesthetic examination and evaluation" on each patient, as well as prescribe the anesthesia plan, participate "in the most demanding aspects of the anesthesia plan including, if applicable, induction and emergence," and provide any necessary post-anesthesia care.  42 C.F.R. § 415.110(a).  Also see, 42 C.F.R. § 482.52(a)(3); 42 C.F.R. § 414.46(a)(2), (c), or (d)(1); 42 C.F.R. § 415.110(a) and (b). He must also personally document that he performed each of these tasks.  42 C.F.R. § 415.110(b).

100.  By leaving the procedures early, before completion of all of the required tasks that are required to adhere to the anesthesia services regulations in deep sedation cases, Dr. Ostroff knowingly violated the regulations and caused the submission of false claims for each every endoscopic procedure requiring deep sedation.

101.  Nevertheless, Dr. Ostroff scheduled almost all of these procedures in just five hours, from 8:00am-1:00pm.    The only way for Dr. Ostroff to perform all of these procedures is for him to allow unsupervised residents to perform most of the procedure, while he is away working on other patients.

102.  Similarly, on January 13, 2006, Dr. Ostroff scheduled five EGDs, six colonoscopies, and six ERCPs, in three different rooms located on three different floors during the six hour block from 8:00am-2:00pm.

103.  As there is no way for Dr. Ostroff to be physically present for the entirety of any procedure that is occurring at the same time as another procedure, any and all claims presented for such procedures are false.

104.  The simultaneous scheduling described above has continued on an ongoing basis since 2002, and it is continuous and ongoing.

///

///

SECOND AMENDED COMPLAINT – Case No. 12-CV-0200-JCS

**E.**     **Submission of False Certifications to the Government**

105.   To assist in the administration of Medicare Part A, CMS contracts with "fiscal
intermediaries." 42 U.S.C. § 1395h.  Fiscal intermediaries, typically insurance
companies, are responsible for processing and paying claims and cost reports.

106.   To assist in the administration of Medicare Part B, CMS contracts with "carriers."
Carriers, typically insurance companies, are responsible for processing and paying Part B
claims.

107.   Beginning in November 2006, Medicare Administrative Contractors ("MACs") began
replacing both the carriers and fiscal intermediaries. *See* Fed. Reg. 67960, 68181 (Nov.
2006). The MACs generally act on behalf of CMS to process and pay Part A and Part B
claims and perform administrative functions on a regional level. *See* 42 § C.F.R.
421.5(b).

108.   Providers who wish to be eligible to participate in Medicare Part A must periodically
submit an application to participate in the program. The application, which must be
signed and/or electronically submitted by an authorized representative of the provider,
contains a certification statement that states: "I agree to abide by the Medicare laws,
regulations and program instructions that apply to this provider. . . . I understand that
payment of a claim by Medicare is conditioned upon the claim and the underlying
transaction complying with such laws, regulations, and program instructions (including
but not limited to, the Federal anti-kickback statute and the Stark law), and on the
provider's compliance with all applicable conditions of participation in Medicare."

109.   Each physician at the UCSF Medical Center must periodically submit an application to
renew his or her clinical privileges to practice medicine at that facility.  Each such
application contains the following notice (emphasis in original):

**Medicare/TRICARE Notice to Physicians**: Medicare/TRICARE payment to hospitals is based in part on each patient's principal and secondary diagnoses and the major procedures performed on the patient, as attested by the patient's attending physician by virtue of his or her signature in the medical record. Anyone who misrepresents, falsifies, or conceals essential information required for payment of Federal funds may be subject to fine, imprisonment, or civil penalty under applicable Federal laws.

The application also contains the certification: "By my signature below, I acknowledge that I have read and agree to be bound by all of the above information, including the Medicare Notice." Dr. Ostroff and each of the other physicians at the UCSF Medical Center are required to sign this form and make this certification.

110. The Medicare Notice is an essential or integral component of the billing system at the UCSF Medical Center. Based on Dr. Ostroff's signature in the medical record, a review of the entire medical record, including the medical forms and records (such as the Sedation Form, the Gastrointestinal Procedure Report and the Radiological Procedure record), the billing department generates the bills to Medicare, Medicare and other government payors for the procedures performed on the patient as attested to by Dr. Ostroff's signature in the medical record. Specific billing codes are assigned to the various procedures and diagnoses contained in the medical record that is signed by Dr. Ostroff and the bills are prepared based on that documentation. Dr. Ostroff is aware that when the bills are submitted to Medicare, Medicaid and other government payors that the services that are billed must be in compliance with Medicare laws and regulations.

111. Under the Medicare program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient and outpatient services.

112. Upon discharge of Medicare beneficiaries from a hospital, the hospital submits Medicare Part A claims for interim reimbursement for inpatient and outpatient items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60,

413.64. Hospitals submit patient-specific claims for interim payments on a Form UB-92 or UB-04.

113. Defendant Ostroff and other physicians at the UCSF Medical Center submitted or caused to be submitted claims, both for specific inpatient and outpatient services provided to individual beneficiaries, as well as claims for general and administrative costs incurred in treating Medicare beneficiaries.

114. As a prerequisite to payment under Medicare Part A, CMS requires hospitals to submit annually a form CMS-2552, more commonly known as the hospital cost report. Cost reports are the final claim that a provider submits to the fiscal intermediary or MAC for items and services rendered to Medicare beneficiaries.

115. After the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary or MAC, stating the amount of Part A reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. *See also* 42 C.F.R. § 405.1801(b)(1). Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. *See* 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

116. During the relevant time period, Medicare Part A payments for hospital services were determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s and UB-04s) during the course of the fiscal year. On the hospital cost report, this Medicare liability for services is then totaled with any other Medicare Part A liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare Part A beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare Part A program or the amount due the provider.

117.   Under the rules applicable at all times relevant, Medicare, through its fiscal

intermediaries and MACs, had the right to audit the hospital cost reports and financial

representations made by Defendants to ensure their accuracy and preserve the integrity of

the Medicare Trust Funds. This right includes the right to make retroactive adjustments to

hospital cost reports previously submitted by a provider if any overpayments have been

made. *See* 42 C.F.R. § 413.64(f).

118.   Every hospital cost report contains a "Certification" that must be signed by the chief

administrator of the provider or a responsible designee of the administrator.

119.   For all relevant years, the UCSF Medical Center's responsible provider official was

required to certify, and did certify, in pertinent part:

> to the best of my knowledge and belief, it [the hospital cost report] is a
> true, correct and complete statement prepared from the books and records
> of the provider in accordance with applicable instructions, except as noted.
> I further certify that I am familiar with the laws and regulations regarding
> the provision of health care services, and that the services identified in this
> cost report were provided in compliance with such laws and regulations.

120.   For the entire period at issue, the hospital cost report certification page also included the

following notice:

> Misrepresentation or falsification of any information contained in this cost
> report may be punishable by criminal, civil and administrative action, fine
> and/or imprisonment under federal law. Furthermore, if services identified
> in this report were provided or procured through the payment directly or
> indirectly of a kickback or where otherwise illegal, criminal, civil and
> administrative action, fines and/or imprisonment may result.

121.   Thus, the provider was required to certify that the filed hospital cost report is (1) truthful,

i.e., that the cost information contained in the report is true and accurate; (2) correct, i.e.,

that the provider is entitled to reimbursement for the reported costs in accordance with

applicable instructions; (3) complete, i.e., that the hospital cost report is based upon all

information known to the provider; and (4) that the services provided in the cost report

were billed in compliance with applicable laws and regulations, including the Medicare, TRICARE and Medicaid laws and regulations.

122. For each of the years at issue, the Medical Center submitted cost reports attesting, among other things, to the certification quoted above.

123. A hospital is required to disclose all known errors and omissions in its claims for Medicare Part A reimbursement (including its cost reports).

124. In addition to Part A claims, doctors or other providers submit Medicare Part B claims to the carrier or MAC for payment.  Under Part B, Medicare will generally pay 80 percent of the "reasonable" charge for medically necessary items and services provided to beneficiaries. *See* 42 U.S.C. §§ 1395l(a)(1), 1395y(a)(1). For most services, the reasonable charge has been defined as the lowest of (a) the actual billed charge, (b) the provider's customary charge, or (c) the prevailing charge for the service in the locality. *See* 42 C.F.R. §§ 405.502-504.

125. Dr. Ostroff and other physicians caused the UCSF Medical Center to violate the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), by making false statements, or causing false statements to be made by the Medical Center and/or the its intermediary and/or its MAC, to get claims paid by Medicare for designated health services provided on referrals from the physicians with whom they had entered into prohibited financial relationships.  The Medical Center's certifications on its cost reports that its statements were "true" and/or "correct" and that it was entitled to payment of its claims for such services were actually false or fraudulent because Medicare and TRICARE regulations prohibited the Medical Center from receiving payments from the United States for claims for work performed by Dr. Ostroff and other physicians.

126. Despite that Medicare requirements establish that only "qualified" individuals are permitted to administer anesthesia services, see, 42 C.F.R. § 414.46(a)(2) and (d)(1); 42 C.F.R. § 415.110(a)(1), and 42 C.F.R. § 482.52(a), these regulations were knowingly

violated by Dr. Ostroff each time he approved "sedation nurses" to administer deep sedation on his patients who underwent numerous endoscopic procedures.   As a result, of Dr. Ostroff expressly approving and requesting "sedation nurses" to administer deep sedation in violation of the Medicare requirements, and as a result of his attesting to those services in the medical record, claims would be routinely submitted to Medicare, Medicaid and other government payors.

127.   Dr. Ostroff and other physicians further knowingly caused the Medical Center to make, use, and cause others to make or use false records and statements to conceal, avoid or decrease its obligations to pay or transmit money to the United States by certifying on its annual cost reports that the services were provided in compliance with federal law, all in violation of the False Claims Act, 31 U.S.C. § 3729(a). The false certifications, made with each annual cost report submitted to the government, were part of an unlawful scheme to defraud Medicare, TRICARE and Medicaid.

128.   Defendant Ostroff was aware of and created false records that he knew would be relied upon to submit claims to Medicare, Medicaid and other government payors.

129.   Defendant Ostroff signed and filled out the Sedation Form for each endoscopic procedure for which he ordered deep sedation.  For each such procedure, Dr. Ostroff checked the box "Deep sedation" and he personally signed and approved the form knowing that the deep sedation would be performed by sedation nurses who are not qualified pursuant to the Medicare regulations.  See 42 C.F.R. § 482.52(b)(1); 42 C.F.R. § 415.110(a)(1) and (b); 42 C.F.R. § 414.46(a)(2) and (d)(1).  Dr. Ostroff signed the medical record attesting to these records when he knew they were false and would be relied upon to submit bills to Medicare, Medicaid and other government payors.

130.   For each endoscopic procedure requiring deep sedation another form, the UCSF Medical Center Radiologic Procedure Record, is used to document the deep sedation ordered by Dr. Ostroff.  However, the Radiologic Procedure Record form is a false record because

1
2
3
4
5
6
7
8
9
10
11
12

Dr. Ostroff did not complete that record or form as required by the Medicare regulations, and he knowingly permitted the pre-procedure assessment to be completed by a registered nurse who is not one of the persons qualified under the Medicare regulations to complete a pre-anesthesia evaluation. See 42 C.F.R. §482.52(b)(1); 42 C.F.R. §415.110(a)(1) and (b); 42 C.F.R. § 414.46(a)(2) and (d)(1). Also, the Radiologic Procedure Record form documents the intraoperative anesthesia record, but that was not completed by Dr. Ostroff, as required by the Medicare regulations, and he knowingly permitted it to be completed by a "sedation nurse" who is not qualified to complete the form or perform the service. See 42 C.F.R. §482.52(b)(2); 42 C.F.R. §415.110(a)(1) and (b); 42 C.F.R. § 414.46(a)(2) and (d)(1). Dr. Ostroff signed the medical record attesting to these records when he knew they were false and would be relied upon to submit bills to Medicare, Medicaid and other government payors.

13
14

131. Dr. Ostroff knowingly created false records for numerous endoscopic procedures he knew were in violation of the Medicare regulations.

15
16
17

132. Dr. Ostroff and other physicians caused the Medical Center to present, or cause others to present, all of the false claims described herein with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard that such claims were false and fraudulent.

18
19
20
21
22
23
24
25
26
27

133. As set forth herein, Dr. Ostroff and other physicians knowingly caused the Medical Center to submit false certifications and false claims because any procedure involving deep sedation performed by a sedation nurse would not be eligible for Medicare reimbursement, but it was their practice to regularly and routinely use sedation nurses in violation of the Medicare regulations. This practice was not limited to procedures performed by Dr. Ostroff, nor was this practice of violating the Medicare regulations regarding sedation limited to ERCP procedures. Significantly, the other gastroenterologists who perform endoscopic procedures on deeply sedated patients at the UCSF Medical Center collectively perform thousands of procedures that are then

28

improperly billed to Medicare, TRICARE, Medicaid, and other government and private insurance.

134.   In addition, other UCSF Medical Center departments used sedation nurses to administer deep sedation to patients and this widespread practice also violated the Medicare regulations on sedation.  For example, the Radiology department uses sedation nurses to administer deep sedation, as it shares its nurses with the gastroenterology department. Accordingly, Defendants' regular use of sedation nurses to administer deep sedation and to perform monitored anesthesia care in the UCSF Gastroenterology and Radiology departments violated the Medicare regulations sedation.

135.   Additionally, Dr. Ostroff and other physicians knowingly caused the Medical Center to submit false certifications because they violated 42 C.F.R. § 415.172(a) and other Medicare regulations cited herein governing the attendance of teaching physicians during procedures.  Moreover, Dr. Ostroff and other physicians caused the Medical Center to make false certifications because they violated the Medicare statute prohibiting the billing for unnecessary procedures and unreasonable charges.  42 U.S.C. §§ 1395l(a)(1), 1395y(a)(1); 42 C.F.R. §§ 405.502-504.

**F.      Damages to the United States**

136.   Dr. Ostroff and any other physicians who engaged in similar practices are also liable under the FCA for every claim they caused to be presented to Medicare, Medi-Cal, or other federal insurance programs, as a result of their signatures in the medical record as the patients' attending physicians, for procedures in which a sedation nurse administered deep sedation and/or performed monitored anesthesia care, including but not limited to all procedures in the UCSF Gastroenterology and Radiology departments that were submitted in violation of the Medicare sedation regulations.

137.   In regards to ERCP procedures performed at UCSF, Dr. Ostroff alone performs more than 1,100 ERCPs each year, and these procedures account for only 40-50% of his clinical practice, indicating that he performs at least 2,200 procedures per year.  Dr. Ostroff may actually perform considerably more.  All of the procedures that are billed to Medicare, Medicaid or other government payors depend on the signature of Dr. Ostroff in the medical record as the attending physician as a condition precedent to preparing the bills.

138.   Relator conservatively estimates that at least 40% of the procedures performed by Dr. Ostroff and other physicians are billed to and paid by Medicare, Medi-Cal, or some other federal insurance program.

139.   While there are numerous different types of ERCP, EGD, and colonoscopy procedures, they all fall under the following (non-exhaustive) APC codes for Medicare billing:

| Procedure | APC Code | HCPCS Codes |
|---|---|---|
| ERCP | 0151 | 43260 |
|  |  | 43261 |
|  |  | 43262 |
|  |  | 43263 |
|  |  | 43264 |
|  |  | 43265 |
|  |  | 43267 |
|  |  | 43271 |
|  |  | 43272 |
| ERCP with Stent | 0384 | 43268 |
|  |  | 43269 |
| Upper GI Procedures (EGD) | 0141 | 43200 |
|  |  | 43201 |
|  |  | 43202 |
|  |  | 43204 |
|  |  | 43205 |
|  |  | 43215 |
|  |  | 43217 |
|  |  | 43220 |
|  |  | 43226 |
|  |  | 43227 |

SECOND AMENDED COMPLAINT – Case No. 12-CV-0200-JCS

| | | 43231 |
|---|---|---|
| | | 43232 |
| | | 43234 |
| | | 43235 |
| | | 43236 |
| | | 43237 |
| | | 43238 |
| | | 43239 |
| | | 43240 |
| | | 43241 |
| | | 43243 |
| | | 43244 |
| | | 43245 |
| | | 43246 |
| | | 43247 |
| | | 43248 |
| | | 43249 |
| | | 43250 |
| | | 43251 |
| | | 43255 |
| | | 43258 |
| | | 43259 |
| | | 43458 |
| | | 43499 |
| | | 43761 |
| | | 43831 |
| | | 49440 |
| | | 49441 |
| | | 49446 |
| | | 91111 |
| EGD with Stent | 0384 | 43219 |
| Lower GI Procedures (Colonoscopy) | 0143 | 44388 |
| | | 44389 |
| | | 44390 |
| | | 44391 |
| | | 44392 |
| | | 44393 |
| | | 44394 |
| | | 44397 |
| | | 45378 |
| | | 45378 |
| | | 45379 |
| | | 45380 |
| | | 45381 |

SECOND AMENDED COMPLAINT – Case No. 12-CV-0200-JCS

| | | 45382 |
|---|---|---|
| | | 45383 |
| | | 45384 |
| | | 45385 |
| | | 45386 |
| | | 45387 |
| | | 45391 |
| | | 45392 |
| Colonoscopy with Stent | 0384 | 44397 |
| | | 45387 |
| Colorectal Cancer Screening (Colonoscopy) | 0158 | G0105 |
| | | G0121 |

140.  The approved reimbursement to outpatient facilities for these procedures for past ten years is as follows:

| APC | 0151 | 0384 | 0141 | 0143 | 0158 |
|---|---|---|---|---|---|
| 2002 | $778.32 | $778.32 | $367.02 | $370.07 | $333.42 |
| 2003 | $913.13 | $913.13 | $386.57 | $412.85 | $368.38 |
| 2004 | $979.16 | $1,127.24 | $426.70 | $452.62 | $405.08 |
| 2005 | $1,067.26 | $1,543.28 | $460.00 | $490.01 | $441.10 |
| 2006 | $1,107.92 | $1,600.58 | $480.03 | $509.34 | $449.56 |
| 2007 | $1,219.41 | $1,410.54 | $511.26 | $538.99 | $446.00 |
| 2008 | $1,334.45 | $1,591.17 | $541.59 | $563.60 | $500.02 |
| 2009 | $1,448.77 | $1,697.77 | $571.58 | $593.76 | $528.10 |
| 2010 | $1,524.12 | $1,785.67 | $589.55 | $613.74 | $545.40 |
| 2011 | $1,600.38 | $1,915.43 | $611.73 | $643.41 | $569.89 |

141.  Estimating that Dr. Ostroff spends half of his time doing ERCPs and splits his remaining time evenly between EGDs and colonoscopies (which is supported by the scheduling chart), and assuming that 40% of his procedures were charged to Medicare of Medi-Cal, Relator estimates that Defendant has defrauded the federal government of an average of between $500,000 and $1 million per year for Dr. Ostroff's work.

142.  The fraudulent conduct by Dr. Ostroff and other physicians described herein is ongoing and continuous.  Damages to the United States include, but are not limited to, three times

the full value of all funds paid as a result of the false claims, false certifications and fraudulent conduct described herein.

143.   Each false claim and false certification presented to the United States is also subject to a civil penalty of up to $11,000 under the False Claims Act, plus an adjustment for inflation under the Federal Civil Penalty Inflation Adjustment Act of 1990.

## II.   VIOLATIONS OF 42 U.S.C. § 1983

144.   The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

145.   Plaintiff-Relator Maa began his work with Defendant UCSF Medical Center as an intern and resident from 1994 until 2002.  After completing his residency, the Medical Center appointed Dr. Maa as a Clinical Instructor.  On April 1, 2005, the Medical Center promoted Dr. Maa to Assistant Professor in Residence, Step 1.  On July 1, 2007, Dr. Maa received a merit advancement to Assistant Professor in Residence, Step 2.  By October 1, 2009, Dr. Maa advanced to Assistant Professor in Residence, Step 3. The position of Assistant Professor, In Residence is a tenure-track position, and the next level of advancement or promotion would be to the position of Associate Professor.

146.   Throughout his education and career, Dr. Maa has received the highest honors, receiving numerous scholarships and awards.  In July 2005, Dr. Maa created the UCSF Surgical Hospitalist program to improve the quality of emergency surgical care, which has now been adopted by over 400 hospitals nationwide.  The UCSF Surgical Hospitalist program, which Dr. Maa continues to direct, has been featured in numerous publications, including the Journal of the American College of Surgeons (2007), the Journal of the American Medical Association (2008 and 2012), and the New England Journal of Medicine (2011).

147. In 2006, UCSF medical students and residents nominated Dr. Maa for the prestigious Kaiser Teaching Award.  In 2008, UCSF awarded Dr. Maa the Haile T. Debas Academy of Medical Educators Excellence in Teaching Award, and the Western Group on Educational Affairs gave him the Prize for Best Research Project Involving a Medical Student.  In 2009, Dr. Maa was named one of the "Top 20 People Making a Difference in Healthcare in America" and the American College of Surgeons awarded him a Health Policy Scholarship to study leadership in health policy at Brandeis University.  In 2010, Dr. Maa received the Kaiser Teaching Award in Ambulatory Care from the UCSF medical students and residents, and was asked to serve as an Editor of General Surgery News.  Dr. Maa was named "Top Doctor" by Marin Magazine in 2011 and 2012, and in both 2012 and 2013 was named one of San Francisco's "Super Doctors" by Key Professional Media.  In 2012, Dr. Maa was also elected as President of the Northern California Chapter of the American College of Surgeons, an office he will assume in 2013.

148. Dr. Maa has been invited to deliver lectures across the nation on emergency care and health policy.  After suffering harassment and retaliation for engaging in protected speech and his views as a witness in a state court proceeding, as set forth more fully herein, Dr. Maa took professional leave for most of 2010 and 2011 to work on Capitol Hill with both Senate and House Members of Congress, the newsprint, radio and television media, the Department of Health of Human Services, and leading medical organizations, to better understand the problems in emergency care and strengthen the Affordable Care Act. Over the past two years he has appeared on CSPAN, published letters to the Editor in several major newspapers, and spoken on radio shows and television to discuss health reform and ways to address the emergency care crisis.  In 2011, 2012 and 2013, he received grant funding from the American College of Surgeons Division of Health Policy

and Advocacy to advocate for improved quality of care and solutions to the emergency care crisis in California with members of the California Legislature in Sacramento.

149.  On March 21, 2008, Patient Jane Doe underwent an ERCP performed by Dr. Ostroff and assisted by a gastroenterology Fellow named Dr. James Buxbaum.  Patient Doe had been complaining of atypical pain following the removal of her gallbladder, which may have been caused by a gallstone.

150.  During the ERCP, as was the standard practice at UCSF Medical Center, Dr. Ostroff did not use an anesthesiologist or a nurse anesthetist.  Instead, Patient Doe was placed into deep sedation and monitored by a nurse, Donna Hayes.

151.  Donna Hayes is a "sedation" nurse who is not qualified to deeply sedate a patient or perform monitored anesthesia care without supervision.

152.  Consistent with the standard practice of Dr. Ostroff and the UCSF Medical Center, however, Nurse Hayes was not supervised by an anesthesiologist.

153.  During the ERCP, Nurse Hayes was unable to keep Patient Doe in a state of deep sedation, which caused Patient Doe to experience significant discomfort when the endoscope was inserted into her throat; she began moaning and thrashing around on the examination table to the extent that she dislodged the IV from her arm and she had to be restrained.

154.  Improper sedation and movement by the patient during an endoscopic procedure greatly increases the risk of complications and makes it more difficult to properly perform the procedure.

155.  As a result of the improper sedation, Dr. Ostroff may have terminated the ERCP without completing his examination.  Nevertheless, Dr. Ostroff claimed that the ERCP had been completed and had revealed nothing to explain Patient Doe's symptoms.

156.  After the ERCP, Patient Doe developed pancreatitis and tests revealed elevated liver function.  Dr. Ostroff recommended that she undergo a second ERCP to place a stent to ensure there was no blockage of the bile duct to her liver.

157.  Five days after her first ERCP, Patient Doe took Dr. Ostroff's advice and underwent a second ERCP.

158.  During this second ERCP procedure, Patient Doe was placed into deep sedation by a sedation nurse named Foster Steele, who was not supervised by an anesthesiologist.

159.  At some point during this second ERCP, Patient Doe stopped getting oxygen, possibly due to receiving a very large dose of the powerful opiate Fentanyl, and eventually went into cardiac arrest.

160.  About ten minutes before the cardiac arrest began, an alarm went off on an oxygen monitor indicating that the oxygen level of Patient Doe's blood had dropped to dangerous levels.  Rather than summon an anesthesiologist, Nurse Steele assumed that the oxygen sensor was malfunctioning and decided to change to a different oxygen monitor.

161.  The radiology technician, Diana Johnson, believed that something was wrong, so called in Nurse Hayes to assist.  Nurse Hayes helped Nurse Steele hook up a second monitor.

162.  This second monitor initially registered normal oxygen readings, but then it too began to record low oxygen.  It was at this time that Patient Doe began to go into cardiac arrest and Nurse Steele called the "Code Blue," finally summoning an anesthesiologist and other physicians to assist.

163.  While waiting for the Code Blue team to arrive, Dr. Ostroff began performing CPR and mouth to mouth resuscitation on Patient Doe.

164.  By the time the Code Blue team, including Plaintiff-Relator Maa, arrived to assist, Patient Doe had likely been without oxygen for more than ten minutes.  Dr. Maa and the Code Blue team managed to stabilize Patient Doe's vitals, but after so long without oxygen, Patient Doe was almost entirely brain dead.

165. Whether due to lack of training or inattention, the sedation nurse did not realize that there was a serious problem until Patient Doe began to go into cardiac arrest.  Had an anesthesiologist been present and immediately available within the operating room when the first oxygen monitor began reading low oxygen, he or she might have recognized the danger and saved Patient Doe's life.  Instead, an anesthesiologist was not summoned until ten minutes later, after the second oxygen monitor began to read low oxygen and Patient Doe had begun to go into cardiac arrest.  It was then an additional six minutes before the Code Blue team arrived and intubated and defibrillated Patient Doe.  By this time it was too late.

166. In or about March of 2009, Patient Doe's husband and family filed in the Superior Court of the State of California a complaint for damages against the Regents of the University and Does One through One Hundred, alleging negligence and wrongful death of Patient Doe, and the case subsequently settled.  Plaintiff-Relator was identified as witness in the case brought by the family of Patient Doe, and Dr. Maa was noticed for deposition and testified at a deposition in that matter.  During the course of the case brought by the family of Patient Doe the individual Defendants Adler, Ascher, Desmond-Hellmann, Green, Gropper, Hawgood, Laret, Marshall and Penney, became aware that Plaintiff-Relator would testify in that matter adverse to the individual defendants named herein, and adverse to the named defendants in the case brought by the family of Patient Doe.

167. Prior to engaging in activities protected by the First Amendment, as set forth more fully herein, Dr. Maa's peers also had nothing but praise for his work.  His teaching evaluations are universally excellent and he has received very positive reviews from his students, who consistently rate him better than 4.5 on a 5 point scale.  In a letter dated November 29, 2008, Dr. Ascher commented that "Dr. Maa is an excellent clinician and teacher.  He has been an essential member of the Department of Surgery faculty and the

SECOND AMENDED COMPLAINT – Case No. 12-CV-0200-JCS

faculty of UCSF as a whole.  I am confident that Dr. Maa will be approved for an on-time promotion."

168.   In short, Dr. Maa is an exemplary physician with numerous publications, awards, professional accomplishments, who, prior to speaking on matters of public concern and engaging in First Amendment protected activity, had a bright career ahead of him. Following the death of Patient Jane Doe and Dr. Maa engaging in protected activity, however, Dr. Maa's career at UCSF took a dramatic turn.

169.   Prior to undergoing the ERCPs with Dr. Ostroff, Patient Doe had been treated by Dr. Maa.  When Patient Doe went into cardiac arrest during her second ERCP with Dr. Ostroff, Dr. Maa was one of the physicians who attempted to revive her.

170.   Dr. Maa closely followed the investigation into the cause of Patient Doe's death.  In his capacity as Patient Doe's physician and the Vice Chair of the UCSF Department of Surgery Quality Improvement Program, Dr. Maa also reviewed the documentation that had been done during and after Patient Doe's ERCP and wrote a Quality Improvement Report regarding his findings.  In that report, Dr. Maa concluded that Patient Doe had likely died as a result of "Management – sedation and monitoring," i.e. errors in the administration of anesthetic drugs.

171.   Dr. Maa spoke with many of his colleagues after Patient Doe's cardiopulmonary arrest and before the withdrawal of support, to exclude all other possible explanations of the event.  In the course of those discussions, Dr. Maa explored every reasonable explanation of the sudden unexplained cardiopulmonary arrest during the ERCP.  In the end, Dr. Maa concluded that the only reasonable explanation for Patient Doe's death was inadequate monitoring and likely oversedation at the time of the second ERCP.

172.   The San Francisco Medical Examiner, after a nearly yearlong investigation, concluded that Patient Doe's death was an "accident" caused by "therapeutic complications" of the ERCP.

173.   UCSF, the UCSF Medical Center and most, if not all of the Defendants named herein, however, have maintained to the present day that the cause of Patient Doe's death was unknown.

174.   Instead, the Medical Center found that the cause of Patient Doe's death was "inconclusive."  In support of that conclusion, the Defendants suppressed and ignored the Plaintiff-Relator's Quality Improvement Report, which had found that Patient Doe had likely died as a result of "Management – sedation and monitoring."

175.   In fact, because the UCSF Medical Center settled a case alleging negligence brought by Patient Doe's family for more than the statutory minimum of $30,000, which triggers a reporting requirement to the Medical Board, and because Dr. Ostroff was the attending physician during the procedure when Patient Doe died, the Medical Center was obligated to report Dr. Ostroff to the Medical Board of California pursuant to California Business and Professions Code § 801.01.  However, none of the defendants or UCSF or the Medical Center did this, and they have continued to fail to do this and they have declined to re-review the matter of Patient Doe's death despite Dr. Maa's repeated requests.

176.   The Medical Center was also obligated to report Patient Doe's unexpected respiratory arrest to the California Medical Board for review, but failed to do so.

177.   In March of 2009, Patient Doe's family filed a complaint for damages in the Superior Court of the State California against the Regents of UCSF for medical negligence and wrongful death (hereinafter, "Patient Doe lawsuit").

178.   Dr. Maa was noticed for deposition to testify as a witness in the state court lawsuit filed by the family of Patient Doe.

179.   Following the filing of the state court lawsuit by the family of Patient Doe, Dr. Maa engaged in activity protected by the First Amendment, including but not limited making disclosures internally to the UCSF Medical Center, and in connection with his status as a

witness, about his knowledge of events concerning the cause of death of Patient Doe that would be the basis of his testimony at deposition in the state court lawsuit.

180.   For example, in December 2009, Dr. Maa explained to Defendants Adler and Penney that it would be his testimony that Patient Doe's death had been an accident caused by oversedation and/or improper monitoring.  Dr. Maa expressly stated that he would repeat this information if asked about the cause of Patient Doe's death during a deposition in the state lawsuit.  Dr. Adler and Ms. Penney were antagonistic and hostile towards Dr. Maa throughout the meeting.  Dr. Maa's communications during this meeting are protected by the First Amendment because they relate directly to his status as a witness in a legal proceeding and the disclosures at issue concern Dr. Maa's anticipated testimony in a deposition in a state court proceeding. Additionally, shortly after this December 2009 meeting, Dr. Maa informed Susan Penney by telephone that a witness reported that the sedation record in Patient Doe's medical chart had been substituted, and was not the original form being completed by Foster Steele during Patient Doe's second ERCP.

181.   Defendants failed to acknowledge the true cause of Patient Doe's death, failed to make mandatory reports, and acted in concert to suppress the true cause of death and retaliate against Plaintiff for his expected testimony in the Patient Doe lawsuit.

182.   For example, following Dr. Maa's December 2009 disclosures (including the substituted sedation record), Defendant Penney began making disparaging comments about Dr. Maa to his peers and supervisors, and the other Defendants named in this action.  She repeatedly attacked his character and loyalty and accused him of playing "cloak and dagger" with evidence.

183.   On or about January 27, 2010, Defendant Penney informed Dr. Maa that he was being "separated" from the other healthcare providers who would be witnesses in the Patient Doe case.  She told him that he had a "very different perspective" than the other doctors and that the Medical Center would provide him with counsel that would help him prepare

1

2

for his deposition.  She also told him that, if he did not like the attorney chosen by the
Medical Center, he would have to retain a different one at his own expense.

3

4

184.   Shortly thereafter, Dr. Maa learned that Defendant Penney had met with Defendant Dr.

5

Nancy Ascher, the Chair of the Department of Surgery and one of Dr. Maa's supervisors.

6

Defendant Ascher told Dr. Maa that Penney had said that he was "the problem" with the

7

defense of the Patient Doe litigation.  Defendant Penney also told Defendant Ascher that,

8

if Dr. Maa did not choose one of the attorneys selected for him by the Medical Center,

things would "get hostile."

9

10

185.   In order to protect himself, and at his own expense, Dr. Maa then sought out and retained

11

an outside attorney.  Out of fear of retribution, Dr. Maa did not inform the Medical

Center that he was seeking outside counsel.

12

13

186.   Dr. Maa's deposition in the Plaintiff Doe case was scheduled for April of 2010.  In the

14

weeks before the deposition, Dr. Maa met with the attorney assigned to him by the

Medical Center, as well as his private counsel.

15

16

187.   Prior to his deposition, during the Spring of 2010, Dr. Maa submitted an application for

17

promotion to the position of associate professor, the next step in his tenure-track series.

18

The application included numerous letters of recommendation praising his clinical and

19

teaching abilities.  The Medical Center and School of Medicine Promotions Committee

never responded to his application.

20

21

188.   So as to not risk angering the Medical Center or the individual Defendants, Dr. Maa

22

appeared for deposition in April of 2010 with only the attorney assigned by the Medical

23

Center, even though Dr. Maa had retained another private counsel.  The attorney

24

representing Patient Doe's family began the deposition, but barely made it past the

25

formalities before the attorney representing the Medical Center adjourned the deposition

due to another appointment.

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

189.   At or about the time of Dr. Maa's deposition, UCSF, the UCSF Medical Center, through their attorneys, and the named Defendants, were aware of Dr. Maa's expected testimony in the Patient Doe lawsuit deposition, and they became aware that Dr. Maa had retained his own private attorney to represent him.

190.   Prior to the resumption of Dr. Maa's deposition the Medical Center offered a very large settlement to Plaintiff Doe's family, which they accepted.  Notwithstanding that the Patient Doe lawsuit was over, the retaliation by Defendants against Dr. Maa continued.

191.   Defendant Penney, who was Director of Risk Management, set in motion a series of acts by others which Defendant Penney knew or reasonably should have known would cause others to inflict harm against Dr. Maa and which contributed to or resulted in the constructive denial of Plaintiff's requests for promotion, his constructive discharge and other adverse actions identified herein.  Defendant Penney acted with intent to retaliate against Plaintiff for engaging in protected activities.

192.   In July 2010, the Risk Management department at UCSF Medical Center, which was headed by Defendant Penney, placed a report prepared by Dina O'Reilly in Dr. Maa's personnel file.  The report, which contained several factual inaccuracies and contradictions, inaccurately summarized the events leading up to the death of Patient Doe and the report wrongfully accused Dr. Maa of participating in several unprotected conversations with various providers and that he made unsubstantiated allegations regarding Patient Doe's case.  The report refers to Patient Doe's ERCP procedures but failed to mention that Dr. Maa was not the attending physician during those ERCP procedures.  Dr. Maa is the only physician mentioned in the report which attempts to place blame on Dr. Maa.  The report further stated that Dr. Maa's allegations about the cause of Patient Doe's death became part of the evidence in the case and weakened UCSF's and the Medical Center's ability to defend the lawsuit, and that Dr. Maa's "unpredictability" as a witness contributed to the decision to settle the case.  Dr. Maa was

not given a copy of this report and did not discover its existence until December 2010, when he applied for his bi-annual reappointment.

193.   The report blaming Dr. Maa's expected testimony in the Patient Doe lawsuit for weakening the defense of that suit was made available to all of the individual Defendants named herein who were members of the Credentials Committee or otherwise participated in decisions whether to renew Dr. Maa's credentials, appointments and his requests for promotion.  All of those named Defendants (Dr. Adler, Dr. Adrianne Green, Susan Penney, Dr. Nancy Ascher, Dr. Susan Desmond-Hellman, Dr. Sam Hawgood, Dr. Michael Gropper, Mr. Mark Laret, and Dr. Sally Marshall) did, in fact, rely on the information contained in the risk management report and Dr. Maa's protected activity to take adverse employment actions against Dr. Maa, continuing from 2010 through the present.

194.   It is the standard practice of UCSF Medical Center to have each of its physicians apply for reappointment to its staff every two years.  During the reappointment process, the applicant submits letters of recommendation from his peers and supervisors and the Credentials Committee of the Medical Center reviews the applicant's work during his/her prior appointment.

195.   Following Dr. Maa's protected activity as a witness in the Patient Doe lawsuit, Dr. Maa submitted his December 2010 reappointment application, he was contacted by the Credentials Department and informed of the existence of the July 2010 Risk Managment report.  The Credentials Department asked Dr. Maa to explain his involvement with the Plaintiff Doe case and address the issues raised in the report.  In response, Dr. Maa by letter dated December 10, 2010, pointed out that although the report was dated July of 2010 he had not not been provided a copy until December, and the information in the report had not been disclosed to him previously.  Dr. Maa's letter also pointed out that the report contained several factual inaccuracies, that he was a witness in the Patient Doe

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

lawsuit, his treatment of Patient Doe was not at issue in the Patient Doe lawsuit, and that his treatment of Patient Doe was proper and ethical at all times.  Dr. Maa requested that the report be corrected and/or removed from his file.  Dr. Maa once again described his conclusions about the Patient Doe case that differed from the Medical Center's defense of the case and which were known prior to his deposition in the case.  Dr. Maa also expressed concern that the report was put into his file as an attempt to retaliate against him for his role as a witness in the Patient Doe lawsuit.

196.    The following Defendants were part of either the Credentials Committee meeting of December 14, 2010, or the Executive Medical Board ("EMB") and Governing Body meeting of December 22, 2010, which met and determined not to remove the July 2010 Risk Management report from Dr. Maa's file: Dr. Adler, Dr. Adrianne Green, Susan Penney, Dr. Nancy Ascher, Dr. Susan Desmond-Hellman, Dr. Sam Hawgood, Dr. Michael Gropper, Mr. Mark Laret, and Dr. Sally Marshall.  Instead, these Defendants met and decided to deny Plaintiff's application for the standard two year reappointment and appointed him for only a single year.  Individuals involved in making the decision to limit Dr. Maa's reappointment to one year include, but are not limited to, Dr. Adler, Dr. Adrianne Green, Susan Penney, Dr. Nancy Ascher, Dr. Susan Desmond-Hellman, Dr. Sam Hawgood, Dr. Michael Gropper, Mr. Mark Laret and Dr. Sally Marshall.

197.    By letter dated December 28, 2010, Plaintiff wrote to Defendant Chancellor Susan Desmond-Hellman to request that the Patient Doe case be re-opened so as to perform an inquiry into the events of what happened.  Plaintiff suggested that the San Francisco Office of the Medical Examiner's Report on the cause of death of Patient Doe might be a good starting point.  Plaintiff wrote letters on December 28, 2010 to Defendants Adler and Laret expressing concern that important information about the Patient Doe case had not been adequately evaluated regarding the cause of death.

198.   By letter dated January 1, 2011, Dr. Gropper wrote to Dr. Maa (with a copy to Dr. Ascher, stating that the Credentials Committee met on December 14, 2010 and "thoroughly reviewed your file including your letter explaining" his position as a witness in the Patient Doe case and in response to the July 2010 Risk Management Report. Defendant Gropper informed Dr. Maa that after reviewing the report and Dr. Maa's response, the committee had based its decision to recommend a one-year appointment in part because of the issues raised in the recredentialing process related to the Patient Doe case.  Defendant Gropper also informed Dr. Maa that Defendant Ascher would provide him with "the necessary support and education involving professional malpractice cases or other legal issues."

199.   On January 13, 2011, Plaintiff wrote to Dean Hawgood (defendant herein) to provide information about the allegations in the risk management report regarding the Patient Doe case and to express concerns about the handling of the matter.

200.   On January 19, 2011, Dr. Maa wrote a letter to the Risk Management Department, attaching a copy of his December 10, 2010 letter, and inquiring whether the July 2010 report had been either corrected or removed from his file.  Dr. Maa also stated in his January 19, 2011 letter that "the final report of the San Francisco Medical Examiner's Office concluded that the death of this patient was an accident, resulting from therapeutic complications after the repeat ERCP performed on March 26th, 2008."

201.   By email dated February 7, 2011, Defendant Penney, Director of Risk Management, responded to Plaintiff's requests for Risk Management to withdraw its report by stating it would not withdraw the report but that some corrections would be made.  Defendant Penney also refused to provide Plaintiff with a copy of any corrected report.

202.   On February 8, 2011, Plaintiff responded to Defendant Penney's email of February 7, 2011, by stating that there still existed factual inaccuracies in the proposed corrections by

1
2
Risk Management, and that these continuing inaccuracies raise important questions about the quality of reviews of the Patient Doe case.

3
4
5
6
7
8
9
203. By email dated February 11, 2011, Plaintiff wrote to Defendant Gropper asking that the Credentials Committee reconsider the recommendation of a one year reappointment because the Risk Management Report was not accurate. Plaintiff also informed Defendant Gropper about continuing concerns about the cause of death of Patient Doe and that the final report of the San Francisco Medical Examiner's Office on the cause of death contradicts and refutes the allegations set forth in the Risk Management Report that was placed in Plaintiff's file.

10
11
12
13
204. On March 1, 2011, Plaintiff sent to Defendant Adler a copy of the February 7-8, 2011 emails between Defendant Penney and Plaintiff.  On March 2, 2011, Plaintiff sent to Defendants Adler and Gropper email correspondence from Defendant Penney dated April 8, 2008 discussing the Medical Examiner's review of Patient Doe's death.

14
15
16
17
18
205. Between March 3-5, 2011, Plaintiff exchanged emails with Defendant Ascher in which Plaintiff continued to raise additional concerns about the Risk Management Report and the multiple errors and Risk Management's attempt to conceal the fact that the most likely cause of death for Patient Doe was medical error and inadequate monitoring of the deep sedation administered during the repeat ERCP.

19
20
21
22
23
24
25
26
206. Chancellor Dr. Desmond-Hellman, writing on behalf of the entire Governance Advisory Council ("GAC") and its individual members (including Defendants Laret, Hawgood, Adler and Gropper) responded to Plaintiff by letter dated March 9, 2011, stating that the GAC had concluded that the review of the Patient Doe case "has been thorough and complete and that no further review or investigation is warranted."  Defendant Desmond-Hellman informed Plaintiff that the GAC's conclusion was based on "an external review of the case which was completed within 3 months of the event" as well as other reviews.

27
28

207.  Defendant Desmond-Hellman's March 9, 2011 letter did not reference the San Francisco Medical Examiner's Report in the Patient Doe case which was not issued until more than a year after Patient Doe's death, nor did she discuss the discrepancies between the reviews mentioned in the letter with the official cause of death reported by the Medical Examiner.

208.  At the time of these letters in 2011, the Medical Center had not reported the malpractice case or the alleged negligence of Dr. Ostroff and others to the State Medical Board, nor did it go through the required allocation process to assign responsibility to the healthcare providers for the death of Patient Doe and the malpractice settlement, and they still have not done so.

209.  Defendants ignored Dr. Maa's requests and they failed to properly review or report the circumstances of Patient Doe's death to the State Medical Board, as required by law.

210.  In November 2011, Dr. Maa again applied for a two year reappointment.

211.  On December 7, 2011, Dr. Maa, through counsel, presented a letter to Defendants Adler and Laret informing them that Dr. Maa had "contacted the Attorney General of the State of California and federal officials to report violations of state and federal laws that pose a serious danger to the public health, as well as violations of the Federal False Claims Act… the California False Claims Act… and the California Insurance Frauds Prevention Act" related to fraudulent billing to Medicare, Medi-Cal, and private insurance.  In addition, Dr. Maa's counsel informed Defendants Adler and Laret that on behalf of Dr. Maa they were disclosing to state and federal authorities other violations of state and health and safety laws.  The letter also referred to some of Dr. Maa's prior internal reports about some of these matters.  Dr. Maa's speech in this letter from his counsel to Defendants Adler and Laret is protected by the First Amendment.

*212.*  Plaintiff's official job duties did not include reporting misconduct or testifying in a state court wrongful death action.  Rather, Plaintiff's official job duties as an Assistant

Professor in the Department of Surgery included teaching surgical skills, participating in education sessions for residents and medical students, lecturing in classes and mentoring medical students, as a clinical faculty member.  Plaintiff's official duties also included attending Grand Rounds and performing medical research and/or clinical services (such as treating patients and performing surgeries) at the hospital.

213.   Plaintiff's internal speech that relates to: 1) Plaintiff's expected testimony in the state lawsuit; 2) his later concerns about the improper handling of the Patient Doe case after it was settled and the suppression of the true cause of Patient Doe's death which was not properly reported to the State Medical Board; 3) his concern that he was being retaliated against for his role as a witness in the Patient Doe case; and 4) fraudulent billing practices were made outside the scope of Plaintiff's official job duties and are distinct from the earlier report he wrote on the cause of Patient Doe's death.

214.   After the settlement of the Patient Doe personal injury lawsuit, Plaintiff made additional reports to upper management officials and the university Chancellor in late 2010 and in 2011 raising concerns about suppression of the true cause of Patient Doe's death. These follow up concerns about misconduct were not made as part Plaintiff's normal job duties or as part of the prior investigation into the cause of death of Patient Doe, which was long closed and after the Doe lawsuit was settled. This aspect of Plaintiff's speech was not in his capacity of writing an official Medical Center report or in his capacity of serving on a Medical Center committee. By the time Plaintiff wrote letters to upper management and the University Chancellor, in late 2010 and in 2011, he no longer attended Quality Improvement Committee meetings and these letters and communications were not part of any officially assigned duties.  Plaintiff communicated these good faith and reasonable beliefs after the Patient Doe case had settled, to inform upper management officials and the university Chancellor that misconduct had occurred in suppressing the true cause of Patient Doe's death, that the university had not held accountable those who caused the

death of Patient Doe and not properly reported it to the State Medical Board as required by law. It is not a physician's job, or Plaintiff's official job duty, to report this kind of misconduct, or to request such corrective action after a matter has been closed.

215. Plaintiff's choice to express through his own private counsel concerns about violations of law in the areas of public health and safety, the death of a patient, billing fraud and other wrongdoing at the Medical Center, and notifying Medical Center officials that Plaintiff was reporting concerns to California Attorney General and U.S. Attorney General, is not within the scope of Plaintiff's official duties.  Plaintiff's decision to speak through his attorneys about such matters is protected by the First Amendment right to freedom of association and speech and not within the scope of Plaintiff's official job duties.

216. In response to the December 7, 2011 letter, the Medical Center's Chief Campus Counsel, Marcia Canning, wrote by letter dated December 22, 2011, that she was responding on behalf of Defendants Laret and Adler to the letter from Dr. Maa's counsel and that she had reviewed Dr. Maa's prior written communications with various UCSF leaders and there was no indication of Dr. Maa raising any concerns about billing practices.  Ms. Canning also stated "there is nothing more we can do to follow up." Additionally, Dr. Maa was informed of the decision to again appoint him for only a single year, citing "unprofessional conduct."

217. By email sent on behalf of Defendant Gropper on December 27, 2011, Plaintiff received the summary of the recommendations of the Credentials Committee concerning Plaintiff's one-year reappointment, which were approved by the Executive Medical Board ("EMB") and the Governing Body.  The EMB oversees the Credentials Committee, the Professionalism Committee and other committees and is composed of the senior leadership and department chairs.  Individuals involved in making the decision to limit Dr. Maa's reappointment to one year include, but are not limited to the following Defendants who also serve on one or more the above-referenced committees, the EMB or

the Governing Body: Dr. Adrienne Green, Susan Penney, Dr. Nancy Ascher, Dr. Susan Desmond-Hellman, Dr. Sam Hawgood, Mr. Laret, Dr. Michael Gropper, and Dr. Sally Marshall. The communication sent to Plaintiff on behalf of Defendant Gropper on December 27, 2011 confirmed that at the meetings held by the Credentials Committee, the EMB and the Governing Body to consider Plaintiff's appointment the above-referenced individual Defendants further discussed Plaintiff's discussions about Patient Doe's case with persons who were not under the legal protections to discuss the case, and stated that his actions had contributed to the decision to settle Patient Doe's case. For these alleged transgressions, the Credentials Committee through Dr. Gropper referred Dr. Maa to the Committee on Professionalism for review. Without requesting Plaintiff's position or providing an opportunity for hearing in advance, the Professionalism Committee adopted the recommendation of the Credentials Committee, EMB and Governing Body and found that Plaintiff was "unprofessional." These allegations are false and are pretext for taking adverse action against Plaintiff in retaliation for his protected activities.

218. In February, 2012, Dr. Maa again submitted an application for promotion to the position of associate professor, the next step in his tenure-track series.

219. Also on February 22, 2012, Plaintiff asked Defendant Ascher to provide him with a copy of a letter from the Committee on Academic Promotions ("CAP") to the Vice Provost Sally Marshall in 2011. Plaintiff needed a copy of the letter from the CAP to the Vice Provost concerning the earlier promotion request to decide whether he should re-apply for promotion to Associate Professor In Residence or to submit a request for promotion to the Associate Professor Clinical series. Plaintiff had not previously been provided with a copy of that correspondence about a prior promotion in 2011, and he was never informed of the results of that promotion application in 2011. Despite Plaintiff's requests for a

copy of the CAP letter, Defendant Ascher refused to provide Plaintiff with a copy of the 2010 and 2011 correspondence concerning Plaintiff's earlier request for a promotion.

220.   In April 2012, Dr. Nancy Ascher, Chair of the Department of Surgery, and Dr. Hobart Harris, Chief of General Surgery, called Dr. Maa into a meeting.  In that meeting, Dr. Ascher informed Dr. Maa that he would not be promoted from his current position and that the only way for him to stay employed with the UCSF Medical Center was for him to leave the tenure-track series and accept a non-tenure-track position as an adjunct professor.  Believing that he had no other options, and having received no written correspondence either approving or denying his promotion requests, Dr. Maa accepted the adjunct position under pressure of removal.  Dr. Maa's acceptance of the adjunct position was the result of a constructive discharge from his tenure track position.

221.   Individuals involved in making the decision to deny Dr. Maa's application for promotion to associate professor and limit his employment opportunities to non-tenure-track adjunct positions include, but are not limited to, Dr. Adler, Mr. Laret, Dr. Adrian Green, Susan Penney, Dr. Nancy Ascher, Dr. Susan Desmond-Hellman, Dr. Sam Hawgood, Dr. Michael Gropper, and Dr. Sally Marshall.  These Defendants attended meetings of the Credentials Committee, EMB or Governing Body, or otherwise discussed the decision to limit Plaintiff's employment opportunities and deny his requests for promotions, in 2010, 2011 and 2012, and they knowingly, willfully and wantonly acted with malice to injure Dr. Maa and deny him a tenure-track position, thus causing his constructive discharge.

222.   The salary for the adjunct position is approximately 46% less than Dr. Maa received as an assistant professor.  Moreover, after one year as an adjunct, Dr. Maa will no longer receive any salary at all and will instead be expected to generate his own income from outside grants and other funding.

223.   At the time that these meetings and discussions about a change in series from Assistant Professor to Adjunct Professor occurred in the Spring of 2012, Defendants Ascher,

52

Green, Gropper, Hawgood, Laret, Adler and Marshall intentionally concealed from Plaintiff the fact that Plaintiff's prior request for promotion to an Associate Professor position had been approved by the UCSF Medical School faculty.  Plaintiff did not discover this important fact, which the above-referenced individual Defendants willfully concealed from him, until Plaintiff reviewed his personnel file on or about November 4, 2012.  Plaintiff was not allowed to obtain a copy of key documents in his personnel file but he was permitted to review it on or about November 2, 2012, at which time he learned for the first time that in response to his request for a promotion in 2010 the faculty voted 24 to 3 (with 1 abstention) to approve the promotion of Plaintiff to Associate Professor In Residence, Step 1, effective July 1, 2011.  Plaintiff was never notified of this decision other than reading it in the personnel file on or about November 2, 2012.

224.   Also in the personnel file that Plaintiff reviewed on November 2, 2012 was a document entitled "Checklist for Promotions" on which the box "Approved for review" was checked and the form was signed by Donna Ferriero, M.D., Vice Dean Academic Affairs, and dated November 16, 2010.  Plaintiff was never notified of this decision other than reading it in the personnel file on or about November 2, 2012.

225.   On or about November 2, 2012, Plaintiff was also permitted to review but not copy a letter dated April 29, 2011 from the Committee on Academic Promotions to the Vice Provost of UCSF recommending Plaintiff's promotion but as a change in series to Associate Professor of Clinical Surgery, Step 1 (instead of Associate Professor In Residence, Step 1). Plaintiff was never notified of this letter or recommendation other than reading it in the personnel file on or about November 2, 2012.

226.   Defendants Dr. Adler, Mr. Laret, Dr. Adrianne Green, Dr. Nancy Ascher, Dr. Susan Desmond-Hellman, Dr. Sam Hawgood, Dr. Michael Gropper, and Dr. Sally Marshall actively concealed the decisions and recommendations on Plaintiff's prior request for

promotion, including the approvals by the faculty and Vice Dean, Academic Affairs in 2010 and the recommendation of the Committee on Promotions in 2011. The above-referenced Defendants concealed this information deliberately to deny Plaintiff's advancement. In addition, these Defendants acted to prevent the recommended promotion of Plaintiff from taking effect and to delay or deny Plaintiff's subsequent requests for promotion in 2012, and they misled Plaintiff about his employment status when Plaintiff needed to make critical decisions about his career path.

227. By Defendants' intentional acts of concealment of this information from Plaintiff, he lacked important and timely feedback about his promotion applications and there was no opportunity for Plaintiff to reframe his research and clinical activity to achieve promotion within the time limits imposed by institutional rules. For example, there exist rules requiring a faculty member to achieve promotion within eight (8) years – known as the eight year rule. If a faculty member is not promoted to Associate Professor within the eight year rule then adverse consequences occur. In addition, Defendants failed to notify Plaintiff that he was officially denied a promotion and as such Plaintiff was denied his right to appeal a denial of his promotion because he was never notified that his promotion applications were denied. Instead, Defendants acted to delay or not act on Plaintiff's promotion applications, resulting in impeding Plaintiff's career path and harming his reputation, and running time off the eight year clock to prevent Plaintiff's compliance with the eight year rule.

228. Negative comments by Ms. Penney and others, as well as the unfounded accusations of unprofessional conduct and referral to the Committee on Professionalism have severely damaged Dr. Maa's reputation and caused him substantial mental and emotional pain and suffering. As alleged above, Defendant Penney intentionally set in motion a series of acts by other Defendants to deprive Plaintiff of his First Amendment rights and to retaliate for his protected activities. The other named Defendants in this retaliation claim acted

affirmatively to deny Plaintiff's rights, participated in others' affirmative actions, and deliberately omitted or failed to perform acts, all with the intent to deny Plaintiff his rights and to retaliate for his protected activities. Each of the Defendants acted with the intent to suppress or conceal the concerns that Plaintiff expressed regarding the cause of death of Patient Doe, or other concerns that Plaintiff raised through counsel, and they acted with retaliatory animus.

229. Dr. Maa has suffered significant stress, sleeplessness, and other symptoms. Defendants' denial of Dr. Maa's request for two year reappointments and his constructive discharge from the tenure track, the constructive denial of his requests for promotion and transfer to an adjunct position harmed his career.

230. The damage caused to Dr. Maa's reputation and career by Defendants' retaliatory actions can be illustrated in many ways. For example, several patients have canceled surgeries with Dr. Maa because of negative comments spread by Defendants. He has also been denied committee appointments and leadership roles on those committees, been denied support for intramural research grant funding, and has had to relinquish teaching opportunities with medical students. Dr. Maa has had to endure listening to untrue and disparaging comments made about him in conferences, the operating room, and in emails by the Emergency Department providers. In February of 2013, Plaintiff received notice from the Credentials Committee that his clinical privileges had been renewed for 2013 for only six months until July of 2013, at which time they will be reviewed again. Although the Credentials Committee stated in writing in its February 2013 letter that "there are no restrictions" on the clinical privileges Plaintiff has been granted, as a direct result of the retaliatory actions taken by Defendants, other physicians at UCSF have been falsely informed that Dr. Maa lacks clinical credentials and is not permitted to operate on patients or to assist other physicians in the operating room. In a recent incident, Plaintiff was present in the operating room to assist another physician in surgery when the

preparations for the procedure were interrupted because it was falsely alleged that Plaintiff lacked clinical privileges or credentials to operate.  Such false statements are the direct result of Defendants' adverse actions and retaliation and Plaintiff's reputation has been damaged because negative statements have been made about him and the false impression has been created that Plaintiff has been denied clinical privileges when, in fact, he has been granted clinical privileges without restriction (although not for the usual two years).

231.   The actions by Defendants that injured Dr. Maa are in retaliation for protected First Amendment speech.  As a result, Dr. Maa is entitled to damages.

## Count I
### [31 U.S.C. § 3729(a)(1)(A) – Presenting False Claims]

232.   The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

233.   As described in this Complaint, Defendant Dr. James W. Ostroff and other physicians at the UCSF Medical Center knowingly presented and/or caused to be presented, thousands of false and/or fraudulent claims for payment or approval to Medicare, Medi-Cal, and other health insurance programs funded or administered by the United States.  These claims include, but are not limited to:

   a.   every claim for Endoscopic Retrograde Cholangiopancreatographies, Esophagogastroduodenoscopies, colonoscopies, other similar endoscopic procedures;

   b.   every claim for any procedure where a sedation nurse administered deep sedation without the supervision of an anesthesiologist;

234. Dr. Ostroff knew, within the meaning of 31 U.S.C. § 3729(b)(1), that payment of these claims by the United States was contingent upon Defendants' compliance with the terms of the provider agreements for each program and compliance with the requirements of applicable statutes and regulations, including the various Conditions for Participation set forth in the Code of Federal Regulations.

235. By permitting sedation nurses to administer deep sedation without the supervision of an anesthesiologist, Dr. Ostroff knowingly failed to comply with a requirement upon which payment of these claims by the United States was contingent.

236. By permitting residents to perform ERCPs, EGDs, colonoscopies and other similar procedures without the supervision of a teaching physician, Dr. Ostroff knowingly failed to comply with a requirement upon which payment of these claims by the United States was contingent.

237. By performing multiple simultaneous ERCPs, EGDs, colonoscopies and other similar procedures, Dr. Ostroff knowingly failed to comply with a requirement upon which payment of these claims by the United States was contingent.

238. By knowingly failing to comply with requirements upon which payment was contingent, each claim presented by the UCSF Medical Center for such procedures to Medicare, Medi-Cal, and other health insurance programs funded or administered by the United States was false.  Dr. Ostroff caused each such false claim.

239. By knowingly, willfully or recklessly presenting false claims for payment to the United States, Dr. Ostroff has defrauded the United States in contravention of the False Claims Act, 31 U.S.C. §3729(a)(1)(A), to the damage of the treasury of the United States of America, by causing the United States to pay out money that it was not obligated to pay.

In carrying out these wrongful acts, Dr. Ostroff has engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

240. By knowingly, willfully or recklessly causing the UCSF Medical Center and others to present false claims for payment/reimbursement to the United States, Dr. Ostroff has defrauded the United States in contravention of the False Claims Act, 31 U.S.C. §3729(a)(1)(A), to the damage of the treasury of the United States of America, by causing the United States to pay out money it was not obligated to pay.  In carrying out these wrongful acts, Dr. Ostroff has engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

241. As a direct and proximate result of Dr. Ostroff's fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly thousands of false claims that it would not otherwise have paid.

242. Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

243. Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 – $11,000).

244. Dr. Ostroff and any other physicians who engaged in similar conduct are jointly and severally liable for all damages under this Count.

## Count II
### [31 U.S.C. § 3729 (a)(1)(B) – Making Material False Statements and Certifications]

245. The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

246. As described in this Complaint, Defendant Dr. James W. Ostroff knowingly made false statements and certifications and/or caused the UCSF Medical Center and others to make false statements and certifications, that were material to thousands of false and/or fraudulent claims for payment or approval to Medicare, Medi-Cal, and other health insurance programs funded or administered by the United States.  These false statements and certifications include, but are not limited to:

    a. Certification on the UCSF Medical Center's application to participate in Medicare and Medi-Cal that the Medical Center and/or Dr. Ostroff would comply with Medicare and Medi-Cal laws, regulations, and program instructions;

    b. Certification on the Medical Center's annual hospital cost report, form CMS-2552, that the report is (1) truthful, i.e., that the cost information contained in the report is true and accurate; (2) correct, i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, i.e., that the hospital cost report is based upon all information known to the provider; and (4) that the services provided in the cost report were billed in compliance with applicable laws and regulations, including the Medicare and Medicaid laws and regulations.

    c. Certification of compliance with applicable laws and regulations on other forms that were submitted for payment to the government.

247. For each of the years at issue in this Complaint, the Medical Center submitted cost reports certifying that the report was truthful, correct, complete, and that the services provided in the cost report were billed in compliance with applicable laws and regulations, including the Medicare and Medicaid laws and regulations.

248.   Dr. Ostroff knew, within the meaning of 31 U.S.C. § 3729(b)(1), that the certifications the Medical Center made, including but not limited to the certifications contained on its application for participation in Medicaid and Medi-Cal, and its certifications on its annual hospital cost report were material to the United States' decision to pay on any Medicaid and Medi-Cal claim presented by the Medical Center.

249.   By permitting sedation nurses to administer deep sedation without the supervision of an anesthesiologist, Dr. Ostroff knowingly failed to comply with a requirement upon which payment of these claims by the United States was contingent, and caused the Medical Center's statements and certifications of compliance to be false.

250.   By permitting residents to perform ERCPs, EGDs, colonoscopies and other similar procedures without the supervision of a teaching physician, Dr. Ostroff knowingly failed to comply with a requirement upon which payment of these claims by the United States was contingent, and caused the Medical Center's statements and certifications of compliance to be false.

251.   By performing multiple simultaneous ERCPs, EGDs, colonoscopies and other similar procedures in violation of Medicare regulations, Dr. Ostroff knowingly failed to comply with a requirement upon which payment of these claims by the United States was contingent, and caused the Medical Center's statements and certifications of compliance to be false.

252.   Because Dr. Ostroff and other physicians knowingly failed to comply with requirements upon which payment was contingent, each certification on a hospital cost report that the UCSF Medical Center and/or Dr. Ostroff had complied with all applicable laws, regulations, and rules was false.

253.   Because Dr. Ostroff knowingly failed to comply with requirements upon which payment was contingent, each certification on a hospital cost report that the report was truthful was false.

254.   By knowingly, willfully or recklessly making false statements and certifications material to the United States' decision to pay on false claims presented to Medicare, Medi-Cal, and other insurance programs funded or administered by the United States, Dr. Ostroff has defrauded the United States in contravention of the False Claims Act, 31 U.S.C. §3729(a)(1)(B), to the damage of the treasury of the United States of America, by causing the United States to pay out money that it was not obligated to pay.  In carrying out these wrongful acts, Dr. Ostroff has engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

255.   By knowingly, willfully or recklessly causing the UCSF Medical Center and others to make false statements and certifications material to the United States' decision to pay on false claims presented to Medicare, Medi-Cal, and other insurance programs funded or administered by the United States, Dr. Ostroff has defrauded the United States in contravention of the False Claims Act, 31 U.S.C. §3729(a)(1)(B), to the damage of the treasury of the United States of America, by causing the United States to pay out money it was not obligated to pay.  In carrying out these wrongful acts, Dr. Ostroff has engaged in a protracted course and pattern of fraudulent conduct that was material to the United States' decision to pay these false claims.

256.   As a direct and proximate result of Dr. Ostroff's fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly numerous false claims that it would not otherwise have paid.

SECOND AMENDED COMPLAINT – Case No. 12-CV-0200-JCS

257.    Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

258.    Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 – $11,000).

259.    Dr. Ostroff and any other physicians who engaged in similar conduct are joint and severally liable for all damages under this Count.

**Count III**
**[31 U.S.C. § 3729 (a)(1)(G) – Using False Statements to Avoid/Conceal Obligation to Repay Fraudulently Obtained Funds]**

260.    The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

261.    As described in this Complaint, Defendant Dr. James W. Ostroff knowingly presented and/or caused to be presented, thousands of false and/or fraudulent claims for payment or approval to Medicare, Medi-Cal and other health insurance programs funded or administered by the United States.  Dr. Ostroff also knowingly made false statements and certifications and/or caused false statements and certifications to be made, that were material to such false claims.

262.    For each of the years at issue in this Complaint, the UCSF Medical Center submitted hospital cost reports certifying that the report was truthful, correct, complete, and that the services provided in the cost report were billed in compliance with applicable laws and regulations, including the Medicare and Medicaid laws.

263.    Dr. Ostroff knew, within the meaning of 31 U.S.C. § 3729(b)(1), that the certifications the Medical Center made, including but not limited to the certifications on its application

1
2

for participation in Medicare and Medi-Cal, and its certifications on its annual hospital

cost report were false.

3
4

264.    By knowingly, willfully or recklessly causing the Medical Center to make false

5

statements and certifications material to its obligation to repay funds wrongfully obtained

6

from Medicare, Medi-Cal, and other insurance programs funded or administered by the

7

United States, Dr. Ostroff has defrauded the United States in contravention of the False

8

Claims Act, 31 U.S.C. §3729(a)(1)(G), to the damage of the treasury of the United States

9

of America, by failing to repay monies owed to the United States.

10

265.    As a direct and proximate result of Dr. Ostroff's fraudulent and/or illegal actions and

11
12

pattern of fraudulent conduct, the UCSF Medical Center has failed to pay millions of

13

dollars owed to the United States.

14

266.    Damages to the United States include, but are not limited to, three times the full value of

15

all such unpaid monies.

16

267.    Each and every such fraudulent act is also subject to a civil fine under the False Claims

17

Act of five thousand five hundred to eleven thousand dollars ($5,500 – $11,000).

18
19

268.    Dr. Ostroff and any other physicians who engaged in similar conduct are joint and

20

severally liable for all damages under this Count.

21

**Count IV**
**[42 U.S.C. § 1983 – Violations of Plaintiff-Relator's First Amendment Rights]**

22
23

269.    The allegations contained in the above paragraphs are hereby realleged as set forth fully

above.

24
25

270.    Dr. Maa engaged in several instances of speech protected by the First Amendment and

26

outside the scope of his employment with UCSF, including, but not limited to his

27

statements about his expected testimony in the Patient Doe case concerning the events

28

surrounding the death of Patient Doe, his conclusion that her death was the result of improper anesthesia care and monitoring, and his intention to repeat this information if asked about it during a deposition; his statements during other meetings with UCSF Medical Center management concerning the events surrounding the death of Patient Doe, his conclusion that her death was the result of improper anesthesia care and monitoring, and his intention to repeat this information if asked about it during a deposition; his testimony during his May 2010 deposition in the Patient Doe litigation; the internal reports about Dr. Maa's expected testimony as a witness in the Patient Doe case, which were contrary to the Medical Center's position and its defense of Patient Doe's case; his requests to have the Patient Doe case reviewed after the Medical Center failed to properly report matters related to the case to the state Medical Board; and the letter he sent, through counsel, on December 7, 2011, to notify Defendants that Dr. Maa was reporting violations of health and safety laws and violations of laws concerning billing fraud, to state and local authorities, and raising concerns about retaliation against Dr. Maa for his prior reports of some of these matters.

271. All Defendants knew of some or all of Dr. Maa's protected speech.

272. Defendants Dr. Joshua Adler, Dr. Nancy Ascher, Dr. Susan Desmond-Hellman, Dr. Adrianne Green, Dr. Michael Gropper, Dr. Sam Hawgood, Mark Laret, Dr. Sally Marshall, and Susan Penney, intended to and did punish and retaliate against Dr. Maa for making the protected speech described herein.  This punishment and retaliation includes, but is not limited to:

    a.   denying Dr. Maa's request for a two year reappointment in 2010 and 2011 and instead appointing him for less than two years;

b.  denying and delaying Dr. Maa's requests for promotions to the tenure-track position of associate professor;

c.  involuntarily transferring Dr. Maa from the tenure-track position of assistant professor to the non-tenure-track position of adjunct professor and thereby decreasing Dr. Maa's salary by more than 30%;

d.  placing the July 2010 Risk Management report in Dr. Maa's personnel file that was critical of his role as a witness in the Patient Doe case and attributed blame to him for weakening the defense of that case;

e.  negative comments and false accusations of unprofessional conduct; and

f.  constructively discharging Dr. Maa.

273.  As a direct and proximate result of Defendants' actions, Dr. Maa has suffered lost wages and benefits, lost reputation, loss of employment opportunities, embarrassment, humiliation, and mental and emotional distress and suffering.

274.  By their conduct, Defendants have violated 42 U.S.C. § 1983 and the First Amendment of the United States Constitution.  Dr. Maa is entitled to receive actual and compensatory damages, in an amount to proven at trial, punitive damages as well as injunctive and declaratory relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator, on behalf of the United States of America and himself, prays as follows:

(a)    That this Court enter a judgment in an amount equal to three times the amount of damages sustained by the United States as a result of the fraudulent conduct described in this Complaint, including but not limited to the full value of all false claims presented by Defendants

to Medicare, Medi-Cal and any other insurance program administered or funded by the United States;

   (b)  That Plaintiff-Relator be awarded a civil penalty of between $5,500 and $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each and every false claim described herein and presented to, or approved by, the United States or private insurance companies by any person;

   (c)  That Plaintiff-Relator be awarded an amount that the Court decides is reasonable, which shall be not less than 15% nor more than 30% of the proceeds awarded to the United States from a judgment in this action, settlement of the claims, and/or any alternative remedies under the False Claims Act, 31 U.S.C. §§ 3729(a)(1), 3730(c)(5), (d), including but not limited to proceeds from any related administrative, criminal, or civil actions, and the monetary value of any equitable relief, fines, restitution, or disgorgement to the United States and/or third parties;

   (d)  That Plaintiff-Relator be awarded all reasonable attorney fees and costs incurred, with interest, including expert witness fees;

   (e)  That Plaintiff-Relator and the United States be awarded pre-judgment interest on all monies awarded;

   (f)  That Plaintiff be awarded actual and compensatory damages pursuant to Count IV for violations of 42 U.S.C. § 1983, in an amount to be determined at trial;

   (g)  That Plaintiff be awarded punitive damages pursuant to Count IV for violations of 42 U.S.C. § 1983, in an amount to be determined at trial;

   (h)  That Plaintiff be awarded declaratory and injunctive relief pursuant to Count IV for violations of 42 U.S.C. § 1983;

(i)      That Plaintiff be awarded attorneys fees and all costs pursuant to Count IV as permitted by 42 U.S.C. § 1988;

(j)      That Plaintiff-Relator be granted any and all other relief set forth in the False Claims Act and/or available under 42 U.S.C. § 1983 that was not specifically referenced above;

(k)      That Plaintiff-Relator be granted all other relief as the Court may deem just and proper.

Respectfully submitted,


DATED:  May 20, 2013          DICKSON GEESMAN LLP


By: */s/ Kathryn Burkett Dickson*
KATHRYN BURKETT DICKSON

and

DATED:  May 20, 2013          /s/ David K. Colapinto
David K. Colapinto
D.C. Bar #416390
KOHN, KOHN & COLAPINTO, LLP
3233 P Street, N.W.
Washington, D.C. 20007-2756
Phone:  (202) 342-6980
Fax:      (202) 342-6984
Email:  dc@kkc.com
Admitted *Pro Hac Vice*


Attorneys for Plaintiff-Relator

SECOND AMENDED COMPLAINT – Case No. 12-CV-0200-JCS

**JURY TRIAL DEMANDED**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial.

Respectfully submitted,

DATED:  May 20, 2013          DICKSON GEESMAN LLP


By: */s/ Kathryn Burkett Dickson*
KATHRYN BURKETT DICKSON

and

DATED:  May 20, 2013          /s/ David K. Colapinto
David K. Colapinto
D.C. Bar #416390
KOHN, KOHN & COLAPINTO, LLP
3233 P Street, N.W.
Washington, D.C. 20007-2756
Phone:  (202) 342-6980
Fax:      (202) 342-6984
Email:  dc@kkc.com
Admitted *Pro Hac Vice*


Attorneys for Plaintiff-Relator

SECOND AMENDED COMPLAINT – Case No. 12-CV-0200-JCS